**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                                    )
**MICHAEL MOLOCK, et al.,**                     )
                                                                    )
    **Plaintiffs,**                                )
                                                                    )
        **v.**                                        )     **Case No. 16-cv-02483 (APM)**
                                                                    )
**WHOLE FOODS MARKET, INC., et al.,**     )
                                                                    )
    **Defendants.**                             )
_____ )

**MEMORANDUM OPINION AND ORDER**

## I.   INTRODUCTION

Plaintiffs Michael Molock, Randal Kuczor, Carl Bowens, Jose Fuentes, Christopher Milner, Jon Pace, and Sarah Strickland (collectively, "Plaintiffs") are current and former employees of Whole Foods grocery stores in the District of Columbia, Georgia, Maryland, North Carolina, Oklahoma, and Virginia.   On behalf of a putative class of similarly-situated past and present employees of Whole Foods, they bring this action against Defendants Whole Foods Market, Inc. ("WFMI"), and Whole Foods Market Group, Inc. ("WFM Group"), to recover all wages and damages owed to them as a result of the allegedly unlawful manner in which Whole Foods conducted its "Gainsharing" program, a bonus program designed to incentivize individual Whole Foods grocery store departments to operate under budget by sharing cost savings with employees.[1]

Before the court is Defendants' Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint.   For the reasons herein, the court grants in part and denies in part Defendants' Motion to Dismiss.

---

[1] This case is substantially related to two other matters pending before this court.   _See Bartolo v. Whole Foods Market Group, Inc._, Case No. 17-cv-01453-APM; _Vasquez v. Whole Foods Market, Inc._, Case No. 17-cv-00112-APM.

## II.    BACKGROUND

### A.    Factual Background

Each of the seven named Plaintiffs in this action are or were employed in Whole Foods grocery stores throughout the United States.  Second Am. Compl., ECF No. 28 [hereinafter 2d Am. Compl.], ¶¶ 32–99.  Beginning in 1986 and throughout Plaintiffs' employment, Whole Foods stores nationwide used a profit-sharing program—what Whole Foods referred to as its "Gainsharing" program—to incentivize department productivity and revenue.  *Id.* ¶ 15.  Under the program, as part of the employee compensation package, Whole Foods awarded bonuses to employees whose departments performed under budget by automatically distributing the surplus savings among the employees in that department.  *Id.*  During the hiring and orientation process for new Whole Foods stores employees, Defendants provided Plaintiffs with information about the Gainsharing program.  *See id.* ¶ 16 (Benefits Orientation Training illustrations).  Plaintiffs assert that Whole Foods store managers, department team leaders, and human resources employees provided each of them with materials explaining Gainsharing bonuses and expressly represented during their interviews and throughout their employment that mandatory Gainsharing bonuses were part of the employee compensation package.  *See id.* ¶¶ 32–99.  Plaintiffs also assert that throughout their employment, Defendants posted Gainsharing reports listing guaranteed wages for employees to view each month, at least once a month.  *See id.*  Plaintiffs relied on these representations to accept offers of employment, and once employed, to work to increase the productivity of their departments in order to create a surplus.  *See id.*

Once Plaintiffs accepted employment and became Team Members—thereby vesting in the Gainsharing program—they worked to create a surplus in their departments and therefore were entitled to Gainsharing bonuses.  *See id.*  However, each Plaintiff alleges that he or she was

denied these bonuses throughout his or her entire employment at Whole Foods stores, because Defendants intentionally manipulated and undermined the Gainsharing program in two ways: (1) by imposing a nationwide scheme of "shifting" labor costs, and (2) by establishing "Fast Teams." *Id.* ¶¶ 18–25. Under the practice of "shifting" labor costs, if a department came in over budget, Defendants instructed store leadership to "shift" the labor costs of that department to a department that had a budget surplus. *Id.* ¶¶ 18–31. Payroll/Benefits Specialists at each Whole Foods grocery store then effectuated labor cost shifting by manually altering employee time records otherwise automatically recorded in a Kronos computer system and then submitting the manipulated records to WFMI corporate headquarters for payroll processing. *Id.* ¶ 20. As a result of this practice, the Gainsharing bonuses owed to employees of departments that performed under budget—including Plaintiffs—were reduced by the costs unlawfully "shifted" to those departments. *Id.* ¶¶ 24–25. The decision to "shift" labor costs was authorized, made, and ratified at the executive level by Defendants in order to steal bonuses earned by employees nationwide and pad company profits. *Id.* ¶ 21. Additionally, the use of "Fast Teams" allowed employees to float from one department to another, purportedly to help departments out as needed. *Id.* ¶ 22. According to Plaintiffs, however, Defendants used Fast Teams to shift labor costs among departments without properly accounting for their work, thereby failing to administer and pay the appropriate bonuses required by the Gainsharing program. *Id.*

Defendants admitted to misconduct publicly, but claimed that manipulation of the Gainsharing program was an isolated problem, not one that plagued stores nationwide. In public statements, Defendants asserted that the malfeasance occurred in only nine of the 457 Whole Foods stores and was perpetrated by nine store managers who "engaged in a policy infraction that allowed the managers to benefit from a profit-sharing program at the expense of store employees." Defs.'

Mot. to Dismiss Second Am. Compl., ECF No. 30 [hereinafter Defs.' Mot.], Ex. A-1, ECF No. 30-3 [hereinafter AP Article]; *see* 2d Am. Compl. ¶¶ 26, 29; Pls.' Mem. in Opp'n to Defs.' Mot., ECF No. 32 [hereinafter Pls.' Opp'n], Ex., ECF No. 32-4 [hereinafter Washington Post Article]. Defendants terminated those nine store managers.

Plaintiffs Molock, Kuczor, Milner, Bowens, Pace, and Fuentes each were employed in at least one of the nine Whole Foods grocery stores in which Defendants have admitted that employees were deprived of earned Gainsharing bonuses.  2d Am. Compl. ¶ 26.  Defendants subsequently sent Whole Foods executives to the nine stores, where they spoke to store employees—including Plaintiffs—and admitted to misconduct related to the Gainsharing program. Plaintiffs claim that Defendants attempted to pay small sums to employees at these nine stores to "buy peace."  *Id.* ¶¶ 27–28.

### B.    Class Action Allegations

Plaintiffs seek to bring this case on behalf of themselves and all other employees of Whole Foods who were employed by Whole Foods in the District of Columbia, Georgia, Maryland, North Carolina, Oklahoma, Virginia, and throughout the country.  *Id.* ¶ 100.  They seek to define the putative class as "past and present employees of Whole Foods who were not paid wages owed to them under the Gainsharing program."  *Id.* ¶ 101.  Plaintiffs propose to include within the class the following subclasses:

> a.  Past and present employees of Whole Foods who were employed in the District of Columbia and did not receive all earned wages at least twice during each calendar month on regular paydays in violation of the District of Columbia Wage Payment and Collection Law.

> b.  Past employees of Whole Foods who were employed in the District of Columbia and were not paid all earned wages within 7 days after resignation or termination.

    c.   Past and present employees of Whole Foods who were employed in the State of Maryland and did not receive all earned wages at least once in every 2 weeks or twice in each month on regular paydays, in violation of MD Code, Labor and Employment, § 3-502.

    d.   Past employees of Whole Foods who were employed in the State of Maryland and were not paid all earned wages for work that the employee performed before the termination of employment, on or before the employee's next anticipated payday, in violation of MD Code, Labor and Employment, § 3-505.

    e.   Past and present employees of Whole Foods who were employed in the State of Maryland and were not at the time of their hiring provided full and accurate notice of their rates of pay, in violation of MD Code, Labor and Employment, § 3-504.

    f.   Past and present employees of Whole Foods who were employed in the State of Oklahoma and did not receive all earned wages at least twice each calendar month on regular paydays designated in advance by the employer, in violation of 40 Okl. St. § 165.2.

    g.   Past employees of Whole Foods who were employed in the State of Oklahoma and were not paid all earned wages, less offsets and less any amount over which a bona fide disagreement exists, at the employee's next anticipated payday, in violation of 40 Okl. St. § 165.3.

*Id.* ¶ 101(a)–(g).

## C.    Procedural Background

Plaintiffs filed this action on December 20, 2016.  *See* Compl., ECF No. 1.  After Plaintiffs amended their original Complaint, Defendants moved for dismissal, and the court heard oral argument on Defendants' motion on May 19, 2017.  *See* Defs.' Mot. to Dismiss Am. Compl., ECF No. 15.  Before the court ruled, Plaintiffs moved for leave to file a Second Amended Complaint, and over Defendants' objection, the court granted leave to amend.  *See* Mem. Op. & Order, ECF No. 27.

Now on the third iteration of the Complaint, Plaintiffs assert the following claims: (1) breach of contract and breach of the duty of good faith and fair dealing (Count I); (2) unjust enrichment (Count II); (3) failure to pay wages upon discharge in violation of D.C. Code § 32-1303 (Count III); (4) failure to pay wages in violation of D.C. Code § 32-1302 (Count IV); (5) failure to maintain accurate employment records in violation of D.C. Code § 32-1008 (Count V); (6) failure to pay wages upon discharge in violation of Md. Code § 3-504 (Count VI); (7) failure to pay wages in violation of Md. Code § 3-502 (Count VII); (8) failure to inform of wages in violation of Md. Code § 3-504 (Count VIII); (9) failure to pay wages upon discharge in violation of Okla. Stat. tit. 40, § 165.3 (Count IX); (10) failure to pay wages in violation of Okla. Stat. tit. 40, § 165.2 (Count X); and (11) fraud (Count XI).   2d Am. Compl. ¶¶ 107–70.

Defendants moved to dismiss the Second Amended Complaint in its entirety on July 21, 2017, pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure. Defs.' Mot.   Specifically, Defendants contend that: (1) all claims against WFMI and portions of the claims against WFM Group should be dismissed for lack of personal jurisdiction pursuant to Rule 12(b)(2); (2) all claims, including the nationwide class claims, should be dismissed for lack of Article III standing pursuant to Rule 12(b)(1); and (3) all claims should be dismissed for failure to state a claim pursuant to Rule 12(b)(6).   Defs.' Mot., Defs.' Mem. of Points & Auth. in Supp. of Defs.' Mot., ECF No. 30-1 [hereinafter Defs.' Mem.], at 6.   Plaintiffs opposed Defendants' Motion.   *See* Pls.' Opp'n.

Defendants' motion is now ripe for consideration.

## III.   LEGAL STANDARD

Upon a motion to dismiss under Rule 12(b)(2), the plaintiff bears the burden of establishing a factual basis for personal jurisdiction.   *Crane v. N.Y. Zoological Soc.*, 894 F.2d 454, 456 (D.C.

Cir. 1990).   A plaintiff can survive a motion to dismiss if she makes a "prima facie" showing of personal jurisdiction.   *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991).   "[T]o establish a prima facie case, plaintiffs are not limited to evidence that meets the standards of admissibility required by the district court.   Rather, they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain."   *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005).   The court resolves all factual discrepancies in the record in favor of the plaintiff.   *See Crane*, 894 F.2d at 456.

Under Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction.   *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).   In deciding a Rule 12(b)(1) motion, the court "may consider materials outside the pleadings," but "must still accept all of the factual allegations in the complaint as true."   *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005) (citation and alteration omitted). "Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).   As such, "'the plaintiff's factual allegations in the complaint will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."   *Id.* (quoting 5A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. 2d § 1350).

When evaluating a motion under Rule 12(b)(6), the court "construe[s] the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'"   *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)).   The court need not accept as true,

however, "a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Id.* (quoting *Twombly*, 550 U.S. at 570).   A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.*

## IV.   DISCUSSION

### A.   Rule 12(b)(2) Personal Jurisdiction

The court begins by determining whether it can exercise personal jurisdiction over WFMI and WFM Group.   *E.g.*, *Forras v. Rauf*, 812 F.3d 1102, 1105 (D.C. Cir. 2016); *see Williams v. Romarm, SA*, 756 F.3d 777, 781 n.1 (D.C. Cir. 2014) (approving district court's decision to address personal jurisdiction before deciding whether it had subject matter jurisdiction).   Personal jurisdiction takes two forms: (1) "general or all-purpose jurisdiction" or (2) "specific or case-linked jurisdiction."   *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).   The court need not address general jurisdiction here because Plaintiffs only contend that the court has specific jurisdiction over Defendants.   *See* Pls.' Opp'n at 5, 12 (asserting that Plaintiffs have established "specific personal jurisdiction" over WFMI and WFM Group).   Specific jurisdiction is case-specific.   "In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction."   *Goodyear*, 564 U.S. at 919 (citation omitted).   Stated differently, specific jurisdiction exists if a claim is related to or arises out of the non-resident defendant's contacts with the forum.   *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).

8

A plaintiff seeking to establish specific jurisdiction over a non-resident defendant must make two showings. She must "establish that specific jurisdiction comports with the forum's long-arm statute, D.C. Code § 13-423(a), and does not violate due process." *FC Inv. Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1094–95 (D.C. Cir. 2008). As pertinent to this case, the District of Columbia's long-arm statute provides that specific jurisdiction exists if the claim against the non-resident defendant arises from the defendant's:

> (1) transacting any business in the District of Columbia;
> (2) contracting to supply services in the District of Columbia;
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if the defendant regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; [or]
> (5) having an interest in, using, or possessing real property in the District of Columbia[.]

D.C. Code § 13-423(a)(1)–(5). Even if a plaintiff satisfies one of these prongs, due process supplies a "constitutional check" and "sets the outer boundary" for the court's jurisdiction. *Crane*, 814 F.2d at 762. Whether due process is satisfied depends on weighing "the facts of each case . . . against notions of fairness, reasonableness and substantial justice." *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 329 (D.C. 2000). Thus, the propriety of subjecting a defendant to a court's jurisdiction is a case-specific inquiry.

> *1.*   *The Impact of* Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County

The court starts the personal jurisdiction inquiry with the Supreme Court's recent decision in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773 (2017). Defendants assert that application of this case mandates that the court cannot exercise personal jurisdiction over the claims of Plaintiffs Bowens and Strickland or the claims of

absent putative class members outside of the District of Columbia.  The court discusses each contention in turn.

a.    Plaintiffs Bowens and Strickland

In *Bristol–Myers*, "[a] group of plaintiffs—consisting of 86 California residents and 592 residents from 33 other States" brought a mass tort action in California state court arising from injuries allegedly caused by a drug manufactured by Bristol–Myers Squibb.  137 S. Ct. at 1777–78. [2]  Incorporated in Delaware and headquartered in New York, Bristol–Myers Squibb challenged the California state court's exercise of specific jurisdiction over the company as to the claims of the non-resident plaintiffs, none of whom asserted any injury from the drug in California or any other connection to the state.  *Id.* at 1777–80, 1782.  The Court agreed with Bristol–Myers Squibb that the California state court's exercise of personal jurisdiction over the company as to those claims brought by the non-resident plaintiffs violated the Due Process Clause of the Fourteenth Amendment.  Applying "settled principles regarding specific jurisdiction," the Supreme Court explained that the California state court's exercise of specific jurisdiction as to the non-residents' claims was unconstitutional because there was no "connection between the forum and the [non-residents'] specific claims."  *Id.* at 1781.  For instance, the non-resident plaintiffs had not shown that they were prescribed or had purchased or had ingested the drug in California. *Id.*  Nor were any of the non-resident plaintiffs injured by the drug in California.  *Id.*  In short, the Supreme Court reasoned, the non-resident plaintiffs' claims did not comport with due process because none involved any activity or occurrence that took place in California.  *Id.*  The Court also rejected the argument that the similarity of the residents' and non-residents' claims obviated

---

[2] The court discussed *Bristol-Myers* at length in its Memorandum Opinion and Order in *Vasquez v. Whole Foods Market, Inc.*, and incorporates its analysis of that case here.  *See Vasquez v. Whole Foods Market, Inc.*, No. 17-cv-00112, 2018 WL 810232, at *7–*8 (D.D.C. Feb. 9, 2018).

the due process infirmity.   As the Court explained, "[t]he mere fact that other plaintiffs were prescribed, obtained, and ingested [the drug] in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims."   *Id.*   Accordingly, the Court held that the non-resident plaintiffs' claims could not be heard in California state court.

Applying *Bristol-Myers* and "settled principles regarding specific jurisdiction" is fatal to the claims of named plaintiffs Bowens and Strickland.   *See* 137 S. Ct. at 1781.   Of Plaintiffs, Bowens and Strickland are the only ones who fail to allege any activity or occurrence taking place in the District of Columbia in connection with their individual claims.   *See* 2d Am. Compl. ¶¶ 7, 11, 50–58, 92–99.   Bowens is a Maryland resident who has worked only in Whole Foods grocery stores in Virginia, and Strickland is an Oklahoma resident who has worked only in Whole Foods grocery stores in Oklahoma.   *See id.*   By contrast, Molock, Kuczor, and Pace allege that they reside, or continuously worked for Whole Foods grocery stores, in the District of Columbia.   *See id.* ¶¶ 5–6, 10, 32–49, 85–91.   And Plaintiffs Fuentes and Milner likewise allege that they worked for Whole Foods grocery stores in the District, but have also worked in other Whole Foods locations.   *See* 2d Am. Compl. ¶¶ 8–9, 59–69, 70–84.[3]   Thus, unlike the injuries alleged by the other Plaintiffs, the injuries alleged by Bowens and Strickland do not "arise out of or relate to" Defendants' contacts with the forum of the District of Columbia.   Moreover, as in *Bristol-Myers*, the "mere fact" that the other five Plaintiffs in this action either resided or were employed with Whole Foods in the District of Columbia—and "allegedly sustained the same injuries" as Bowens and Strickland—does not confer specific jurisdiction over their claims.   *Bristol-Myers*, 137 S. Ct.

---

[3] The court rejects Defendants' unsupported assertion that it may exercise specific jurisdiction only as to the specific time periods that Fuentes and Milner worked for Whole Foods grocery stores within the District of Columbia.   *See* Defs.' Mem. at 13.

at 1780.   Accordingly, because Bowens's and Strickland's claims, like those of the non-resident plaintiffs in *Bristol-Myers*, arise from conduct outside the forum where they seek to bring suit, this court cannot exercise specific jurisdiction as to their claims.   *Id.*

Plaintiffs protest that *Bristol-Myers* has no effect on the exercise of specific jurisdiction over the claims of Bowens and Strickland because *Bristol-Myers*'s holding—centered on the Fourteenth Amendment—should not apply to a federal court's jurisdictional reach, an analysis governed by the Due Process Clause of the Fifth Amendment.   *See* Pls.' Opp'n at 14.   True, as Plaintiffs point out, the Supreme Court in *Bristol-Myers* left open the question "whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court."   *Bristol-Myers*, 137 S. Ct. at 1784 (citing *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 102 n.5 (1987)).   Indeed, the Court has never squarely addressed the issue raised in *Omni Capital* as to whether "a federal court could exercise personal jurisdiction, consistent with the Fifth Amendment, based on an aggregation of the defendant's contacts with the Nation as a whole, rather than on its contacts with the State in which the federal court sits."   484 U.S. 102 n.5.

But Plaintiffs' argument for limiting *Bristol-Myers* to state courts "buckles under the weight of precedent."   *Livnat v. Palestinian Auth.*, 851 F.3d 45, 54–55 (D.C. Cir. 2017).   As the D.C. Circuit recently explained, "both the Supreme Court and this court have applied Fourteenth Amendment personal-jurisdiction standards in Fifth Amendment cases."   *Id.*   Moreover, courts that have addressed this issue post-*Bristol-Myers* have rejected the constitutional distinction that Plaintiffs make, *see* Defs.' Reply to Pls.' Opp'n, ECF No. 33 [hereinafter Defs.' Reply], at 4 (collecting cases), particularly where, as here, the federal court sits in diversity and assesses state law claims, *e.g.*, *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, No. 17-cv-00564, 2017 WL 4224723, at *4 (N.D. Cal. Sept. 22, 2017) ("[F]ederal courts routinely apply the specific

jurisdiction analysis to defendants in cases that are before them solely on the basis of diversity."). And while Plaintiffs note that concerns of forum shopping are not at play in the Fifth Amendment context in the same way as in state courts, the personal jurisdiction inquiry is not centered solely on such concerns.   Instead, "[a] vital purpose of personal-jurisdiction standards is to ensure[] fairness to the defendant," and "[i]n federal and state courts alike, defendants should face suit only under fair circumstances."   *Livnat*, 851 F.3d at 55 (internal quotation marks omitted).   Here, fairness to Defendants counsels against exercising personal jurisdiction over the claims of Bowens and Strickland, which simply have nothing to do with this forum.   Accordingly, the claims of Bowens and Strickland against Defendants are dismissed for lack of specific personal jurisdiction.

Having concluded that *Bristol-Myers* requires dismissal of the claims of Plaintiffs Bowens and Strickland, the court considers whether it has jurisdiction over the putative class members who are non-forum residents.

b.   <u>Putative Class Members Outside of the District of Columbia</u>

Defendants next assert that, as with Bowens and Strickland, *Bristol-Myers* requires dismissal of the claims of nonresident putative class members from this action.   Plaintiffs disagree, arguing that *Bristol-Myers*, a mass tort action, should not extend to class actions like the instant matter because it "would effectively eviscerate all multi-state class actions and the purpose of [Fed. R. Civ. P.] 23."[4]   Pls.' Opp'n at 13.   In this instance, the court agrees with Plaintiffs and concludes that *Bristol-Myers* does not apply to class actions.   In so holding, the court is persuaded by the analysis of the few courts that have squarely addressed the issue.   In concluding that *Bristol-Myers* was inapplicable in the class action context, those courts focused their analysis on

---

[4]  In her dissent, Justice Sotomayor observed that the majority in *Bristol-Myers* "does not confront the question whether its opinion here would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there."   *Bristol-Myers*, 137 S. Ct. at 1789 n.4 (Sotomayor, J., dissenting).

the material distinctions between a class action and a mass tort action.  *See, e.g.*, *Sanchez v. Launch Tech. Workforce Sols., LLC*, No. 17-cv-1904, 2018 WL 942963, at *1 (N.D. Ga. Feb. 14, 2018); *Fitzhenry–Russell*, 2017 WL 4224723, at *5; *In re Chinese–Manufactured Drywall Prods. Liability Litig.*, 2017 WL 5971622, at *12–14 (E.D. La. Nov. 30, 2017).   As those cases explain, in a mass tort action, each plaintiff is a real party in interest to the complaints; by contrast, in a putative class action, "one or more plaintiffs seek to represent the rest of the similarly situated plaintiffs, and the 'named plaintiffs' are the only plaintiffs actually named in the complaint." *Fitzhenry-Russell*, 2017 WL 4224723, at *5 (citing Fed. R. Civ. P. 23); *see Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982) ("The class-action device was designed as an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.") (internal quotation marks omitted).   Additionally, unlike a mass tort action, "for a case to qualify for class action treatment, it needs to meet the additional due process standards for class certification under Rule 23—numerosity, commonality, typicality, adequacy of representation, predominance and superiority."  *In re Chinese-Manufactured Drywall*, 2017 WL 5971622, at *14.   These additional elements of a class action supply due process safeguards not applicable in the mass tort context.   In light of these key distinctions, and because Defendants have not presented persuasive authority to the contrary, the court joins the other courts that have concluded that *Bristol-Myers* does not require a court to assess personal jurisdiction with regard to all non-resident putative class members.   The court therefore denies Defendants' motion to dismiss the complaint as to non-resident putative class members for lack of personal jurisdiction.

### 2. *Long-Arm Jurisdiction over WFMI*

The court turns to consider whether it can exercise long-arm jurisdiction over WFMI. WFMI is a Texas corporation with its principal place of business in Austin, Texas.   Defs.' Mot.,

Ex. B, ECF No. 30-4 [hereinafter Yost Decl.], ¶ 2.   According to a declaration submitted by Patricia D. Yost, the Global Tax Director for the "administrative arm" of the Whole Foods Market family of companies, "WFMI is . . . a holding company that owns shares of other operating companies, which in turn own and operate the individual Whole Foods market stores."   *Id.* ¶ 4. Yost attests that WFMI does not own or operate any store in the District of Columbia; nor does it conduct or transact any business in any state other than Texas.   *Id.* ¶ 6.   Yost further states that WFMI does not operate, manage, or control the operation of any store's payroll or the Kronos computer system used to track and manage payroll.   *Id.* ¶ 8.   WFMI also does not, according to Yost, set policies for Whole Foods stores and does not regulate or assure uniformity of policies in the stores.   *Id.* ¶ 9.

To counter these assertions, Plaintiffs submit that this court has personal jurisdiction over WFMI for two reasons: first, because Plaintiffs' claims arise out of WFMI's operation of Whole Foods grocery stores in the District of Columbia; and second, because WFMI is the alter ego of WFM Group.   In support of their first theory, Plaintiffs point to three pieces of evidence that they assert establishes WFMI's ownership and operation of stores in the District.   First, they offer WFMI's Form 10-K filing with the Securities and Exchange Commission for the fiscal year ending September 2016, which states that, "As of September 25, 2016, *we operated* 456 stores: 436 stores in 42 U.S. states and the District of Columbia," and identifies four such stores in the District.   Pls.' Opp'n, Ex. 1, ECF No. 32-2 [hereinafter 10-K filing], at 14 (emphasis added).   Second, Plaintiffs point to a comment made by WFMI CEO John Mackey in a news article referring to Whole Foods stores as "our" stores, as well as additional statement by Mackey that "*we operated* . . . 276 stores . . . with locations in 37 states and the District of Columbia, Canada, and the U.K." in a 2007 Letter to Stakeholders.   *See* Washington Post Article; Pls.' Opp'n, Ex. 2, ECF No. 32-3 (emphasis

added).   And third, Plaintiffs offer the Complaint and Answer filed in *FTC v. Whole Foods Market, Inc.*, 07–cv–1021–PLF (D.D.C.), an antitrust enforcement action brought by the Federal Trade Commission ("FTC") to enjoin the merger of Whole Foods and another grocery chain, wherein WFMI admitted in its Answer that "Whole Foods transacts business in the District of Columbia."   *See* Pls.' Opp'n, Ex. 5, ECF No. 32-6; Pls.' Opp'n, Ex. 6, ECF No. 32-7.

This court already has addressed and rejected a similar request to exercise long-arm jurisdiction over WFMI in a related case, and incorporates that analysis here.   *See Vasquez*, 2018 WL 810232, at *7–8.   There too, relying on the same evidence, the plaintiffs in *Vasquez* asserted that personal jurisdiction was warranted over WFMI because it purportedly owned and operated Whole Foods grocery stores in the District.   *Id.*[5]   As was true in *Vasquez*, Plaintiffs in this case have not offered a sufficient factual basis upon which this court can exercise personal jurisdiction over WFMI.

Additionally, Plaintiffs' assertion that the court can exercise jurisdiction over WFMI because it is the "alter ego" of WFM Group fails for the same reason that argument failed in *Vasquez*:   Plaintiffs have not alleged sufficient facts to make out a plausible claim of alter ego liability.   *See id.* *7 n.4.   The only difference between this case and *Vasquez* is that Plaintiffs here offer some argument to support their alter-ego assertion, whereas in *Vasquez* the plaintiffs buried that contention in a footnote.   *Compare* Pls.' Opp'n at 9–12, *with Vasquez*, 2018 WL 810232, at *7 n.4.   That, of course, is a distinction without a difference.   For the same reasons stated in *Vasquez*, Plaintiffs' contention that WFMI is an alter ego of WFM Group is wholly insufficient on the present complaint.   *See Khatib v. Alliance Bankshares Corp.*, 846 F. Supp. 2d 18, 31–33

---

[5] Indeed, the only new piece of evidence offered by Plaintiffs to substantiate its argument that WFMI owns and operates stores in the District are the public statements of CEO John Mackey.   But Mackey's ambiguous references to "we" and "ours" when discussing the Whole Foods family of companies—like the "we" in WFMI's 10-K filings— does not advance Plaintiffs' argument.

(D.D.C. 2012).

To salvage their jurisdictional claims against WFMI, Plaintiffs ask for the opportunity to conduct jurisdictional discovery "in order to investigate the relationship between [WFMI] and [WFM Group]." Pls.' Opp'n at 11. Plaintiffs contend that such discovery would allow them "to determine [WFMI's] contacts with the District," to "establish the 'unity of interest' between [WFMI] and [WFM Group] for purposes of the alter-ego analysis," and "to determine the actual ownership of the Whole Foods stores" in the District. *Id.* at 12. The court finds that jurisdictional discovery as to WFMI is unwarranted because Plaintiffs have not demonstrated "that [they] can supplement [their] jurisdictional allegations through discovery." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000). "Although discovery should be granted freely, it can be denied when the plaintiff has failed to present facts that could establish jurisdiction." *App Dynamic ehf v. Vignisson*, 87 F. Supp. 3d 322, 329 (D.D.C. 2015) (citation omitted). In other words, "'[m]ere conjecture or speculation' that discovery could lead to personal jurisdiction is insufficient for a court to permit it." *Id.* (quoting *FC Inv. Grp. v. IFX Markets, Ltd.*, 529 F.3d 1087, 1094 (D.C. Cir. 2008)). Here, beyond general statements that merely confirm that WFMI and WFM Group are part of the same corporate family, *see* Pl.'s Opp'n at 11–12, Plaintiffs have not presented facts that could establish that WFMI is in fact anything but a holding company that has no contacts with the District. "Where there is no showing of how jurisdictional discovery would help plaintiff discover anything new, 'it [is] inappropriate to subject [defendants] to the burden and expense of discovery.'" *Id.* (quoting *Atlantigas Corp. v. Nisource*, 290 F. Supp. 2d 34, 53 (D.D.C. 2003)). Plaintiffs' unsupported request for jurisdictional discovery is therefore denied.

*     *     *

Before moving on, the court recaps the results of the personal jurisdiction inquiry. The claims of Plaintiffs Bowens and Strickland are dismissed for lack of personal jurisdiction. Furthermore, Plaintiffs did not meet their burden of showing pertinent facts to make out a prima facie case of personal jurisdiction against WFMI; thus, all claims against WFMI are dismissed without prejudice for lack of personal jurisdiction. And, finally, Plaintiffs failed to show that jurisdictional discovery as to WFMI is warranted.

The court turns now to consider whether Plaintiffs have standing to bring their claims against WFM Group either in an individual or representative capacity.

### B.     Rule 12(b)(1) Subject Matter Jurisdiction

####     1.     *Standing of Named Plaintiffs*

According to Defendants, Plaintiffs lack Article III standing to pursue the claims in their Second Amended Complaint because the allegations contained therein are simply too conjectural to establish that Plaintiffs were entitled to any Gainsharing bonuses and, therefore, suffered any injury. Defs.' Mem. at 21. In their view, to accept Plaintiffs' claim that they were entitled to Gainsharing bonuses requires the court to apply "impermissible inferences" and speculation. *See id.* The court disagrees: Plaintiffs have plausibly alleged that they earned Gainsharing bonuses and were denied them because of Defendants' manipulation of the Gainsharing program. *E.g.*, 2d Am. Compl. ¶ 24.

"[E]ach element [of Article III standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the pleading stage, Article III requires no more than "general factual allegations of injury resulting from the defendant's conduct" because on a motion to dismiss, the court "presume[s] that general

allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal citation omitted).   Here, Plaintiffs have satisfied this standard by alleging that: (1) once employed at Whole Foods and vested in the Gainsharing program, each of them "worked hard to increase the productivity of [his or her] department in order to maximize its surplus," *e.g.*, 2d Am. Compl. ¶ 39; (2) on a monthly basis, at least, Whole Foods posted or circulated Gainsharing reports that listed employees' guaranteed wages, *e.g.*, *id.* ¶¶ 38, 55, 67; (3) corporate officials admitted to the practice of shifting labor costs at some of their stores that resulted in the non-payment of earned bonuses, *e.g.*, *id.* ¶¶ 40, 56; (4) the practice of shifting labor costs was a nationwide practice, *e.g.*, *id.* ¶¶ 29–31; (5) store managers at some of their stores were terminated for manipulation of the Gainsharing program, *e.g.*, *id.* ¶¶ 41, 57, 66; and (6) Whole Foods offered to compensate some Plaintiffs to "buy peace," *e.g.*, *id.* ¶¶ 42, 58.   These allegations, viewed in the light most favorable to Plaintiffs, give rise to the plausible inference that Plaintiffs earned Gainsharing bonuses, but did not receive them because of Defendants' misconduct and thus suffered an injury-in-fact to support Article III standing.   *Cf. Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("A dollar of economic harm is still an injury-in-fact for standing purposes.").

## 2.   *Standing on Behalf of Putative Class Members*

The court also rejects Defendants' argument that Plaintiffs cannot pursue claims on behalf of putative class members from states in which Plaintiffs do not reside or suffered no injury. Ordinarily, "[o]utside the class-action context, 'a plaintiff must demonstrate standing for each claim he seeks to press.'" *In re McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 143 (D.D.C. 2016) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).   For class actions, however, "the Supreme Court's cases show 'tension' about 'whether a named plaintiff's ability to represent unnamed class members with somewhat different claims is appropriately addressed under the

rubric of standing or adequacy." *Id.* (internal alterations omitted) (quoting *Gratz v. Bollinger*, 539 U.S. 244, 263 n.15 (2003)).   In light of this "tension," courts—including this District Court—are divided in their treatment of class actions in which named plaintiffs seek to represent classes asserting state-law claims in states where the named plaintiffs do not reside or were not injured. *See id.*   Some courts require that named plaintiffs establish standing for every claim raised on behalf of the class and therefore dismiss claims arising under the states' laws where the named plaintiffs do not reside or were not injured before reaching class certification.   *E.g.*, *In re G-Fees Antitrust Litig.*, 584 F.Supp.2d 26, 36 (D.D.C. 2008) ("[A] case or controversy requires a specific, identified plaintiff who can establish a personal injury under the claim asserted.").   By contrast, other courts permit related claims under other states' laws to proceed to Rule 23 class certification, provided that there is a named plaintiff with standing to raise one claim.   *E.g.*, *McCormick*, 217 F. Supp. 3d at 143.

The court joins the latter category of courts.   "It is more logical to consider named plaintiffs' ability to raise other state-law claims as a question of commonality, typicality, and adequacy under Rule 23, rather than a question of standing."   *Id.* at 144; *see* 1 Newberg on Class Actions § 2:6 (5th ed. 2017) ("[W]hen a class plaintiff shows individual standing, the court should proceed to Rule 23 criteria to determine whether, and to what extent, the plaintiff may serve in a representative capacity on behalf of the class.").   This is because, as the court in *McCormick* explained, "standing analysis cannot address whether one plaintiff should be able to bring claims on behalf of others" in the class action context.   217 F. Supp. 3d at 144.   In other words, Defendants' focus on standing to assert that Plaintiffs cannot represent putative class members from other states is misplaced: the standing inquiry pertains to whether a court has been presented with a real "case or controversy," and does not require analysis of residency or the location of an

injury.   Instead, such considerations are appropriately resolved at the class certification stage, which is "designed precisely to address concerns about the relationship between the class representative and the class."   1 Newberg on Class Actions § 2:6 (5th ed. 2017).   In short, "standing is the wrong conceptual framework for [Defendants'] purpose."   *Dragoslavic v. Ace Hardware Corp.*, 274 F. Supp. 3d 578, 586 (E.D. Tex. 2017).   The court therefore denies Defendants' motion to dismiss the claims of putative class members.[6]

## C.   Sufficiency of Pleading[7]

Having resolved the jurisdictional matters raised by Defendants in their motion, the court moves to the sufficiency of Plaintiffs' Second Amended Complaint, addressing each count in turn.

### 1.   *Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing (Count I)*

Count I of Plaintiffs' Second Amended Complaint advances related claims of breach of contract and breach of the implied duty of good faith and fair dealing arising from the non-payment of bonuses allegedly owed under the Gainsharing program.   "To *prevail* on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach."   *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015); *see also Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 70 (D.D.C. 2005) ("Notwithstanding an at-will employment agreement, an employee and employer may still contract regarding other terms, such as bonuses or stock options.").

---

[6] The court defers ruling on Defendants' request to limit the scope of Plaintiff's Complaint to the 27 states where it alleges WFM Group operates until the class certification stage.   *See* Defs.' Mem. at 25 n.10.

[7] In this round of briefing, the parties do not discuss the substantive law of the jurisdictions in which Plaintiffs' common law claims arise.   Thus, as do the parties, the court limits its analysis of those claims under the law of the District of Columbia, reserving analysis under the laws of other jurisdictions for a later stage.   In future briefing, to the extent the parties ask the court to decide matters on the basis of several states' laws, the parties are to squarely address whether there are material variations in state law.

"However, to *state a claim* for breach of contract so as to survive a Rule 12(b)(6) motion to dismiss, it is enough for the plaintiff to describe the terms of the alleged contract and the nature of the defendant's breach." *Francis*, 110 A.3d at 620 (emphasis added).

At this stage, Plaintiffs have alleged all they need to survive Defendants' motion: a description of "the terms of the alleged contract and the nature of the defendant's breach." *Id.*; *see also Daisley*, 372 F. Supp. 2d at 70–71 (denying motion to dismiss plaintiffs' breach-of-contract claim, where plaintiff plausibly alleged that he and his employer orally modified an offer letter to entitle plaintiff to an annual bonus of up to 100% of his base salary, an annual salary increase, and an initial allocation of stock options "if defined performance objectives were met"; that he satisfied those objectives; and that his employer breached the oral agreement).   Plaintiffs allege that Defendants entered into an oral contract with Plaintiffs by promising to provide each Plaintiff with a compensation package that included automatic bonus payments under the Gainsharing program in addition to a base salary and benefits, in consideration for Plaintiffs' labor. 2d Am. Compl. ¶ 108.   Plaintiffs assert that they performed their end of the bargain by working hard to create a surplus in each of their departments, but that Defendants breached the agreement by "cooking the books" to undermine the Gainsharing program and deprive Plaintiffs of their earned bonuses. *Id.* ¶¶ 109–10; Pls.' Opp'n at 22.   These allegations adequately make out a breach-of-contract claim at the motion-to-dismiss stage.

Defendants urge the court to conclude otherwise, asserting that, as alleged, Plaintiffs' breach-of-contract claim fails because Plaintiffs have not shown that they reached an agreement about the material terms of the Gainsharing program at the time they entered into the oral contracts of employment.   Specifically, Defendants point out that Plaintiffs did not learn about the specifics of the Gainsharing program, including the predetermined goals their departments needed to

achieve to create a surplus, until *after* they began working for Whole Foods stores, thus belying Plaintiffs' claim that the parties orally agreed to all material details.   In support of this argument, Defendants rely on *Steven R. Perles, P.C. v. Kagy*, 473 F.3d 1244 (D.C. Cir. 2007), in which the D.C. Circuit reversed the district court's finding following a bench trial that a junior attorney and her employer entered into an enforceable oral contract entitling her to one-third share of the fee awarded to the firm in each case.  *Id.* at 1246.  The D.C. Circuit held that the junior attorney could not establish the existence of an enforceable oral contract because the evidence established that she and her employer never reached any agreement with regard to two "material terms": (1) how long the junior attorney needed to work on the case to obtain her share of the fee, and (2) the kind of work she would have to do.  *Id.* at 1253.  Absent agreement by both parties regarding these material terms, the court held, no enforceable contract could exist.  *Id.* at 1252.

But *Kagy*'s reasoning—centered on resolving whether the junior attorney could *prevail* on her breach-of-contract claim—is not controlling at this stage.   As Plaintiffs point out, the analysis employed in *Kagy* does not govern whether Plaintiffs' breach-of-contract claim survives a motion to dismiss; rather, whether a valid, enforceable oral contract was actually formed between the parties is an inquiry to be considered at summary judgment.  *See Francis*, 110 A.3d at 625 (finding error in trial court's dismissal of breach-of-contract claim at motion-to-dismiss stage and concluding that "before the [trial] court could find that no valid contract was formed between the parties, it was obligated to treat [defendants'] motion as a motion for summary judgment and to afford [plaintiffs] an opportunity to come forward with affidavits, documentation, or other

evidence to establish precisely what work appellants negotiated to perform and performed" (internal quotation marks and alterations omitted)).   Thus, *Kagy* does not help Defendants.

Likewise, Defendants' citation to *Barros v. GEICO, Inc.*, is inapposite.   There, the court dismissed a plaintiff's conclusory breach-of-contract claim against an insurer because the complaint was "devoid of any facts indicating that a contract between [the insurer and plaintiff] set[] forth a duty that [the insured] ha[d] failed to perform."   79 F. Supp. 3d 32, 36 (D.D.C. 2015). In Defendants' view, the allegations in this case are, like those in *Barros*, too vague and unsubstantiated to identify a duty that Defendants were required to—but failed to—perform. Although *Barros* was decided on a motion to dismiss, its similarity to the instant case ends there. The plaintiff in *Barros* did not allege *any* facts identifying a duty that the insurer failed to perform, and even "concede[d] that [the insurer] ha[d] no duty to pay a claim" under the contract absent circumstances not present in the case.   *Id.* at 38.   Here, by contrast, Plaintiffs' allegations are not "legal conclusion[s] couched as factual allegation[s]" that are not entitled to an assumption of truth at this stage.   *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1137 (D.C. Cir. 2002). Rather, Plaintiffs have plausibly alleged that Defendants owed them a duty of payment of Gainsharing bonuses upon the creation of a surplus in their departments and that Defendants reneged on their promises to pay.   Such allegations are "an appropriate formulation of a claim for breach of contract," and the court accordingly denies Defendants' motion to dismiss the breach-of-contract claim.   *See Ames v. HSBC Bank USA, N.A.*, No. 06-2039, 2007 WL 1404443, at *3 (D.D.C. May 11, 2007) (denying motion to dismiss claim for breach of contract where plaintiff alleged that she was offered various incentives in consideration for her acceptance of a vice

president position and relocation to the District of Columbia and that her employer failed to tender compensation once she performed).

Having concluded that Plaintiffs have stated a claim for breach of contract, the court also denies Defendants' motion to dismiss Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. To state such a claim, "a plaintiff must allege either bad faith or conduct that is arbitrary and capricious." *Abdelrhman v. Ackerman*, 76 A.3d 883, 891–92 (D.C. 2013). "If a party 'evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing.'" *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1133 (D.C. 2015) (quoting *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000)). Here, Plaintiffs have sufficiently alleged that Defendants "evade[d] the spirit" and "willfully render[ed] imperfect performance" of the oral contract for automatic payment of Gainsharing bonuses by engaging in a nationwide manipulation of the program. *See id.* Accordingly, Plaintiffs' breach of the duty of good faith and fair dealing claim survives Defendants' motion.

### 2.    *Unjust Enrichment (Count II)*

Count II of the Second Amended Complaint asserts a claim of unjust enrichment. "Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Smith v. Rubicon Advisors, LLC*, 254 F. Supp. 3d 245, 249 (D.D.C. 2017). For the same reasons the court found Plaintiffs' contractual claims sufficiently pleaded, the court finds that Plaintiffs have sufficiently alleged a claim for unjust enrichment. After conferring a benefit on Defendants—namely, the surplus created by their labor in their respective departments—Defendants unjustly and wrongfully retained the surplus for their own benefit in contravention of

the Gainsharing program.  That allegation is sufficient to state a claim for unjust enrichment. Defendants' arguments to the contrary are unpersuasive and controverted by Plaintiffs' allegations, and the court therefore denies Defendants' motion to dismiss Plaintiffs' unjust enrichment claim.

Defendants alternatively request dismissal of Plaintiffs' claim as duplicative of Plaintiffs' breach-of-contract claim.  It is true that, "[i]n general, a plaintiff cannot maintain an unjust enrichment claim concerning an aspect of the parties' relationship that was governed by a contract."  *Rubicon Advisors, LLC*, 254 F. Supp. 3d at 249.  However, at this stage, Plaintiffs may pursue an unjust enrichment claim as an alternative theory of liability, even if they ultimately cannot recover under both claims.  *See id.* ("A party may state as many separate claims or defenses it has, regardless of consistency." (quoting Fed. R. Civ. P. 8(d)(3))).  The court therefore declines to dismiss Plaintiffs' alternative theory of unjust enrichment.

3.    *State Wage Law Claims (Counts III through X)*

Counts III, IV, VI, VII, VII, IX, and X of Plaintiffs' Second Amended Complaint allege that Defendants violated state wage laws—specifically, the District of Columbia's Wage Payment and Collection Law ("DCWPCL"), D.C. Code §§ 32-1301 *et seq.*; Maryland's Wage Payment and Collection Law ("MWPCL"), Md. Code Lab. & Empl. §§ 3-501 *et seq.*; and the Oklahoma Protection of Labor Act, Okla. Stat. tit. 40, §§ 165.1 *et seq.*—when they failed to pay certain Plaintiffs the bonuses they earned under the Gainsharing program in the manner required by the statutes, both during their employment and after their employment ended.

At the outset, the court grants Defendants' Motion to Dismiss as to Counts IX and X. These claims arise under Oklahoma Protection of Labor Act and pertain to allegations of Plaintiff Strickland, on behalf of herself and all others similarly situated in the Oklahoma subclass.  *See* 2d Am. Compl. ¶¶ 151–62.  As discussed above, *supra* Part IV.A, the court cannot exercise personal

jurisdiction over the claims of Plaintiff Strickland.   The court therefore must dismiss Counts IX and X without prejudice.

As to the remaining claims arising under the DCWPCL and MWPCL, Defendants contend that these claims should be dismissed because Plaintiffs have not shown that the team-based Gainsharing bonuses constitute "wages" within the meaning of these statutes, and therefore fail to state a claim.   Defs.' Mem. at 5, 34.   According to Defendants, because the Gainsharing bonuses are not based on an individual employee's performance, any such bonuses cannot constitute a covered "wage."   The court disagrees.

The DCWPCL establishes requirements "regarding how and when employers must pay their employees' wages [and] it establishes a framework for recovery against an employer who violates its provisions." *Driscoll v. George Wash. Univ.*, 938 F. Supp. 2d 19, 22–23 (D.D.C. 2013).   The MWPCL likewise sets out the terms by which an employer must pay wages to its employees and enables an employee to bring an action against an employer who violates those terms.   *See generally* Md. Code Lab. & Empl. §§ 3-501 *et seq.*   To state a claim under either statute, Plaintiffs must show that the monies claimed satisfy the statutory definition of a "wage." Under the DCWPCL, "wages" mean "all monetary compensation after lawful deductions, owed by an employer for labor or services rendered, whether the amount is determined on a time, task, piece, commission, or other basis of calculation."   D.C. Code § 32-1301(3).   Under the MWPCL, a "wage" means "all compensation that is due to an employee for employment."   Md. Code Lab. & Empl. § 3-501(c)(1).   As relevant here, both statutes define "wage" to include a "bonus."   *See* D.C. Code § 32-1301(3)(A); Md. Code. Lab. & Empl. § 3-501(c)(2)(i).

In support of their argument that the Gainsharing bonuses are not "wages" within the meaning of these statutes, Defendants cite to two cases: *Dorsey v. Jacobson Holman, PLLC*, 756

F. Supp. 2d 30 (D.D.C. 2010), and *Skripchenko v. VIRxSYS Corp.*, No. 13-0004, 2014 WL 4826788 (D. Md. Sept. 26, 2014).   Defendants' reliance on these cases, however, is unavailing.  In *Dorsey*, the plaintiff sought recovery under the DCWPCL for her employer's failure to pay a year-end bonus.   756 F. Supp. 2d at 36–37.   Her employer, however, argued that because her yearly discretionary bonus was not guaranteed compensation, it was not a "wage."   *Id.*   In granting summary judgment in favor of her employer, the court observed that the plaintiff failed to "identify the criteria for bonuses, whether there was any written document of the policy, who decided bonus amounts, or other important aspects of the policy."   *Id.* at 36.   In light of the statutory definition of a "wage," D.C. Code § 32-1301(3), the court concluded that the plaintiff's discretionary year-end bonus could not constitute a wage because it was not "owed" but rather "given only by leave of the employer."   *Id.* (emphasis added).

Quite unlike the year-end bonus in *Dorsey*, which was awarded to employees only "by leave of the employer," 756 F. Supp. 2d at 36, Plaintiffs in this case have sufficiently alleged that payment of a Gainsharing bonus was not subject to any employer discretion, but rather automatic and mandatory upon satisfaction of the condition that the department in which Plaintiffs were employed obtained a surplus.   2d Am. Compl. ¶ 15 (alleging that the "Gainsharing program distributes automatic (non-discretionary) bonuses" to qualifying employees); *cf. Rothberg v. Xerox Corp.*, No. 12-617, 2016 WL 10953882, at *15–19 (D.D.C. Feb. 3, 2016) (citing *Dorsey* and granting summary judgment in favor of employer on plaintiff's claim that employer violated DCWPCL by failing to pay incentive commissions where such payment was "subject to a significant degree of management discretion" and plaintiff "did not satisfy the condition to be entitled to the commission").   That critical distinction makes *Dorsey* inapplicable.

Defendants' reliance on *Skripchenko* is similarly misplaced.   In that case, the district court denied summary judgment to the plaintiff-employees on their MWPCL claim for unpaid "retention bonuses" because there was a genuine issue of fact as to whether the employees were entitled to the bonus such that it constituted a "wage" under the MWPCL.   2014 WL 4826788, at *5–6. Reasoning that a "bonus" is only a "wage" if it was "promised as a term of employment as compensation for the employees' services and [was] not dependent on conditions other than the employees' efforts," the court declined to grant summary judgment to the employees in light of an affidavit from the employer asserting that such retention bonuses were "contingent upon the financial performance of the company."   *Id.* at *3, *6 (citing *Medex v. McCabe*, 811 A.3d 297, 302–03 (Md. 2002)).   But this case is not like *Skripchenko*.   As alleged by Plaintiffs, the Gainsharing program and bonuses were presented as part and parcel of the employee compensation package at Whole Foods grocery stores and, critically, Gainsharing bonuses were not contingent on the discretion of the employer, but on the satisfaction of conditions under the program. *Skripchenko* therefore is distinguishable from the facts of this case.

In any event, *Skripchenko* cannot bear the weight Defendants place upon it.   Defendants assert that *Skripchenko* compels the conclusion that "bonuses" constitute "wages" under the MWPCL *only* if such bonuses are "renumeration for individual efforts and achievements solely within an individual's control."   Defs.' Reply at 18.   But Defendants neglect to cite relevant Maryland Court of Appeals cases interpreting Section 3-505 of the MWPCL to apply "when wages have been promised as part of the compensation for the employment arrangement and all conditions agreed to in advance for earning those wages have been satisfied."   *Catalyst Health Sols., Inc. v. Magill*, 995 A.2d 960, 969 (Md. 2010); *see also Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 672–73 (Md. 2001) ("Once a bonus . . . has been promised as a part of

the compensation for service, the employee would be entitled to its enforcement as wages" under the MWPCL.   In other words, under the MWPCL, the relevant inquiry is not—as Defendants suggest—whether the bonus to be awarded is attributable *solely* to the individual efforts of an employee, but rather whether the bonus is "owed," or has been promised, to the employee subject to certain pre-conditions that must be fulfilled.

In sum, the court concludes that Plaintiffs have, at this stage, sufficiently shown that the Gainsharing bonuses are "wages" within the meaning of the DCWPCL and MWPCL. Defendants' Motion as to Counts III, IV, VI, VII, and VIII is therefore denied.[8]

### 4.    *Fraud (Count XI)*

Count XI of the Second Amended Complaint asserts a fraud claim based on false representations Defendants made to Plaintiffs, during their employment interviews and throughout their employment, that Plaintiffs would be paid mandatory Gainsharing bonuses while employed at Whole Foods stores.   2d Am. Compl. ¶ 164.   Plaintiffs allege that Defendants knew that these representations were false, in light of Defendants' nationwide practice of labor cost shifting, and further that Defendants made these misrepresentations to fraudulently induce Plaintiffs to accept employment and continue working with Defendants.   *Id.* ¶¶ 164–66.   Plaintiffs aver that they relied on these misrepresentations and consequently turned down other employment opportunities, accepted employment with Defendants, and continued to work for Defendants.   *Id.* ¶ 167.

---

[8] Count V of Plaintiffs' Second Amended Complaint, brought pursuant to the record-keeping provision of the D.C. Minimum Wage Revision Act, D.C. Code § 32-1008, likewise survives Defendants' Motion to Dismiss.   Even assuming that Plaintiffs can bring a private cause of action pursuant to this provision, any recovery for Defendants' falsification of Gainsharing program records would be duplicative of any recovery available under the DCWPCL. The court therefore declines to engage in an unnecessary analysis of whether the Act provides a private cause of action at this juncture.   In any event, proof of a violation of the Act's record-keeping requirement potentially will "lighten" Plaintiffs' burden to prove the amount of wages owed to them as a result of Defendants' purported violations of the DCWPCL.   *E.g.*, *Guevara v. Ischia, Inc.*, 47 F. Supp. 3d 23, 28 (D.D.C. 2014) (assessing impact of employer's failure to maintain records under D.C. Code § 32-1008 and the Fair Labor Standards Act, 29 U.S.C. § 211(c), on employee's burden to prove damages); *Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 1, 6–7 (D.D.C. 2010) (same).

Defendants do not attack the individual elements of Plaintiffs' fraud claim but instead seek to dismiss Plaintiffs' fraud claim as improperly duplicative of Plaintiffs' breach-of-contract claim, asserting that Plaintiffs have merely repackaged the allegations sustaining their contract claim as fraud allegations. To that end, Defendants note that "[i]n the field of fraud . . . there is a general reluctance to allow a claim of fraud to proceed when the fraud contemplated by the plaintiff does not seem to be extraneous to the contract, but rather on the performance of the contract itself." *Regency Commc'ns, Inc. v. Cleartel Commc'ns Inc.*, 160 F. Supp. 2d 36, 41 (D.D.C. 2001); *see Plesha v. Ferguson*, 725 F. Supp. 2d 106, 113 (D.D.C. 2010) ("District of Columbia law requires that the factual basis for a fraud claim be separate from any breach-of-contract claim that may be asserted."). In other words, in Defendants' view, because Plaintiffs' fraud claim arises out of the same representations about the Gainsharing program that animate their breach-of-contract claim, those representations cannot provide the basis for an actionable tort.

In the District of Columbia, conduct that occurs during the course of a contract dispute may support a separate fraud claim "when there are facts separable from the terms of the contract" and "when there is a duty independent of that arising out of the contract itself, so that an action for breach of contract would reach none of the damages suffered by the tort." *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008). Thus, to maintain a fraud claim, "the injury to the plaintiff must be an independent injury over and above the mere disappointment of plaintiff's hope to receive his contracted-for benefit." *Id.*

The court agrees in part with Defendants that Plaintiffs have impermissibly repurposed some—but not all—allegations that are duplicative of their breach-of-contract claim. Specifically, Plaintiffs' allegations pertaining to Defendants' misrepresentations regarding automatic payment under the Gainsharing program throughout their employment merely reiterate

Plaintiffs' disappointment in not receiving the benefits bargained for in their oral contract with Defendants.   Because the alleged withholding of such promised bonuses is "the specific behavior the contract required" of Defendants, such allegations cannot be considered "extraneous to the contract." *Regency Commc'ns, Inc.*, 160 F. Supp. 2d at 41–42.   Accordingly, to the extent that Plaintiffs seek to premise their fraud claim on Defendants' violations of the terms and conditions of the oral contract the parties entered into for automatic payments under the Gainsharing program, those allegations are duplicative of the breach-of-contract claim and cannot provide the basis for an independent tort.   *See Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 199 (D.D.C. 2016) (rejecting the plaintiffs' attempt to rely on statements arising from contract negotiations to support a fraud claim "[b]ecause those issues directly involve the terms and conditions of the [contract]").

The remaining allegations supporting Plaintiffs' fraud claims, however, are sufficient to state a claim because they are "based on the misrepresentations that [Plaintiffs] claim [D]efendants made with knowledge of their falsity and with the specific purpose of misleading [Plaintiffs] into taking the job." *Dooley v. Metro. Jewish Health Sys.*, No. 02-4640, 2003 WL 22171876, at *10 (E.D.N.Y. July 30, 2003).   These misrepresentations preceded the formation of the oral contract and, as Plaintiffs allege, induced them to accept employment with Defendants.   "Because of these fraudulent misrepresentations and omissions, Plaintiffs did not face mere contractual disappointment—they entered into a contract . . . that they would not have otherwise." *Jacobson*, 168 F. Supp. 3d at 200.   The injuries arising from the alleged fraud in the inducement are thus sufficiently independent from the injuries stemming from Defendants' alleged failure to pay Gainsharing bonuses as promised in the oral contract.   *See id.*   Accordingly, the court denies Defendants' motion to dismiss Count XI of the Second Amended Complaint.[9]

---

[9] Because the court concludes that Plaintiffs have stated a claim for fraud in the inducement, it need not address

## V.     CONCLUSION AND ORDER

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Second Amended

Class Action Complaint is granted in part and denied in part, as follows:

1.      All claims of Plaintiffs Bowens and Strickland are dismissed without prejudice for

lack of personal jurisdiction.

2.      All claims against WFMI are dismissed without prejudice for lack of personal

jurisdiction.

3.      Counts IX and X are dismissed without prejudice.

4.      Counts I, II, III, IV, V, VI, VII, VIII, and XI may proceed against Defendant WFM

Group.


Dated:   March 15, 2018                                   Amit P. Mehta
                                                          United States District Judge

---

Plaintiffs' alternative argument that the punitive damages they seek are "special damages" that state a claim for fraud. *See* Pls.' Opp'n at 38.