## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

MICHAEL MOLOCK, RANDAL KUCZOR, JOSE FUENTES, CHRISTOPHER MILNER, AND JON PACE, on behalf of themselves and others similarly situated,

    :

    :

    :

    Plaintiffs,    : Case No. 1:16-cv-02483-APM
            Hon. Judge Amit P. Mehta

    v.    :

WHOLE FOODS MARKET GROUP, INC.    :

         :

    Defendant.

---

### STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS ACTION CERTIFICATION, ISSUANCE OF A CLASS NOTICE, AND APPOINTMENT OF CLASS COUNSEL

---

Respectfully submitted,

REGAN ZAMBRI LONG PLLC
Salvatore J. Zambri
Patrick M. Regan
Christopher J. Regan
1919 M Street, NW, Suite 350
Washington, DC 20036
PH: (202) 463-3030
FX: (202) 463-0667
*Plaintiffs' Counsel*

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. - 1 -

II.   STATEMENT OF FACTS ..................................................................................... - 3 -

    A.   Plaintiffs' Employment with Whole Foods ........................................................ - 3 -
        1.   *Michael Molock* ......................................................................................... - 3 -
        2.   *Randal Kuczor* ......................................................................................... - 4 -
        3.   *Jose Fuentes* ............................................................................................ - 5 -
        4.   *Jon Pace* .................................................................................................. - 6 -
        5.   *Christopher Milner* .................................................................................. - 7 -
    B.   Background on Defendant, Whole Foods Market Group, Inc. ........................... - 8 -
    C.   The Gainsharing Program and Corporate Oversight of Gainsharing ................ - 8 -
    D.   Whole Foods' So-Called "Investigation" into Labor Transfers ..................... - 14 -
    E.   Termination of the *Vasquez* Plaintiffs ........................................................... - 21 -
    F.   Whole Foods Hires Deloitte to Cover Up the Scope of its Misconduct; It Backfires ... - 23 -
        1.   *The Payment Analysis for the Nine Stores* ............................................... - 23 -
        2.   *Nationwide Unsupportable Transfer Analysis* .......................................... - 26 -

III.  PROPOSED CLASS .......................................................................................... - 29 -

IV.   ARGUMENT ..................................................................................................... - 31 -

    A.   Legal Standard for Certification under Rule 23 .......................................... - 31 -
    B.   The Court should certify the proposed Class because (1) Rule 23(a) is satisfied and (2) common questions of law and fact predominate over individual ones and a class action is the superior method of adjudication. ................ - 31 -
        1.   *Plaintiffs and the proposed Class satisfy all requirements of  Rule 23(a): numerosity, commonality, typicality, and adequacy of representation.* .............. - 31 -
        2.   *The Class should be certified under Rule 23(b)(3) because common questions of law and fact predominate over individual ones and a class action is the superior method of adjudication.* ........................................... - 37 -
    C.   The Court should approve the Rule 23 Notice and order Defendant to produce class discovery. ........................................................................... - 42 -
    D.   The Court should appoint Regan Zambri Long PLLC to serve as Class Counsel. .......... - 43 -

V.    CONCLUSION .................................................................................................. - 45 -

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

## I.    INTRODUCTION

Class actions play an invaluable role in our society by providing redress for corporate malfeasance when the financial rewards of such misbehavior are concentrated in the corporation's coffers, but the harm is more thinly spread over a sea of ordinary people. Without the class action mechanism, rational individuals might not bother to bring legal claims even when their rights have been violated—each one would have to incur not only legal fees (which might be done on a contingency basis), but also astoundingly high case costs, all against an adversary with virtually limitless resources, incentivizing it to increase the costs at every turn. The class action evens the playing field, allowing that sea of ordinary people to band together to obtain justice for the harms inflicted on them. The class action also serves an indispensable role for society more broadly— by ensuring that corporations may be held accountable for their misdeeds just like the public at large; it serves as a check on their misbehavior.

This is the quintessential case for class certification. Although this litigation has spanned some six and one-half years and nearly one million pages of documents, at its core, it is a simple— and depressingly familiar—story of corporate greed. A huge grocery chain (now owned by literally one of the largest corporations this planet has ever seen) incentivized its front-line workers to work ever harder to increase its profits, promising that they would share in the financial rewards of their toils. The front-line workers took the grocer at its word. They worked hard. They delivered on their end of the bargain. But their loyal work was betrayed.

It turned out that their managers—and their managers' managers, at the global corporate headquarters inevitably referred to as simply "Global"—were cooking the books. They manipulated payroll records, the real-time logs of their workers' honest days' work, to benefit the managers and the corporation. They picked workers' pockets to pad the corporation's. And when

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

word began to leak out about the nationwide pickpocketing practice, Whole Foods tried to sweep it under the rug, vilifying a small subset of culpable managers as "bad apples" and making representations to investors, the public, and even the Court that evidence now shows Whole Foods could not possibly have believed to be true even at the moment it voiced them.

Plaintiffs are some of the front-line grocery workers who are the victims of Whole Foods' fraudulent wage theft. They and their colleagues—in their scores of thousands—were harmed through precisely the same malfeasance by Whole Foods. Over the past six and one-half years, Plaintiffs have pursued claims on behalf of themselves and Whole Foods's other victims. To ascertain the details of Whole Foods's malfeasance, Plaintiffs' counsel has sifted through some 747,000 pages of documents over the course of thousands of hours of working on the case. No rational individual worker would shoulder those litigation costs merely to recover his or her own slice of damages. But through a class action, all those workers can together receive the justice they are due. For the reasons discussed in the subsections that follow, the Court should certify the proposed class.

To that end, Plaintiffs respectfully request that the Court enter an Order:

(1) certifying the proposed class under FED. R. CIV. P. 23 ("Class");

(2) requiring Whole Foods to produce a list of every Class member, including the last known address, telephone number, and email address for each individual Class member;

(3) approving the form and content of, and directing the distribution of, the proposed Notice and accompanying forms, attached as Exhibit 53; and

(4) appointing Regan Zambri Long PLLC to serve as Class Counsel.

## II.    STATEMENT OF FACTS

### A.    Plaintiffs' Employment with Whole Foods

#### 1.    Michael Molock

Michael Molock began working for Whole Foods in April of 2012 and is still employed by Whole Foods. (Ex. U, Molock Dep., at 37:14-18, 48:14-16). Molock has worked at the P Street store in Washington, DC, as a team member in the specialty department and prepared foods department. (Ex. U at 48:14-49:08, 51:06-52:04). Molock worked under Victor Vasquez, who served as the Store Team Leader ("STL") of the P Street store. (Ex. U at 52:13-16).

As part of the hiring process, Molock was told about Defendant's Gainsharing program[1] by his team leader, Rosalia. (Ex. U at 88:04-89:18). STL Vasquez was present during the hiring process. (Ex. U at 152:15-154:02). According to Molock, in his more than ten years as a Whole Foods employee, he was never provided with a written policy on Gainsharing. (Ex. U at 94:12-95:06). The only written information that he ever received about Gainsharing was contained in the General Information Guide ("GIG") provided to him at the time he was hired. (Ex. U at 147:07-150:21). During his tenure, Molock did not receive Gainsharing payments that he had expected, and he had no knowledge that the Gainsharing program was being manipulated. (Ex. U at 114:15-116:15, 155:03-07).

Molock brought this as a class action "to get justice for everyone." (Ex. U at 152:10-14).

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

---

[1]    At all times relevant during Plaintiffs' employment, Whole Foods had a corporate "Gainsharing" compensation program. Under the Gainsharing program, as James Michael "Mike" Grady (Senior Business Analyst at Whole Foods) explained, Whole Foods awarded wages in the form of bonus payments to employees whose departments come in under budget for the department. (Ex. D, Grady Dep., at 29:04-31:04; Ex. 102 at 112:09-113:09).

### 2. Randal Kuczor

Randal Kuczor worked for Whole Foods from approximately October 2003 until 2015 in the P Street Store in Washington, DC. (Ex. V, Kuczor Dep., at 25:01-26:10, 31:13-32:02 (retirement date)). He worked under STL Vasquez, and Nick Miano and Katia Sadoudi were his Assistant Store Team Leaders ("ASTLs") at various points. (Ex. V at 21:20-23:01). Kuczor learned about the Gainsharing program when he was first interviewed for the job in the P Street store, during which he was promised monthly payments when certain requirements were met. (Ex. V at 21:20-23:01). When Kuczor took the Whole Foods job, he had other business opportunities, as he had run his own business as a freelancer and also had a job opportunity for a business that operated between the United Kingdom and Detroit. (Ex. V at 30:16-31:02). Kuczor decided to accept Whole Foods' offer based on the proximity to his house "[a]nd seriously, with the way the gainsharing was described to [him] it seemed like it would be a good place to work and it would be a lucrative place to work." (Ex. V at 31:03-10.)[2]

Over time during his employment, Kuczor felt that his Gainsharing payments were decreasing, but due to the lack of transparency, he had no idea how they were calculated, nor did he know that the program was being manipulated through the inappropriate transfer of labor. (Ex. V at 48:06-49:04).

Kuczor decided to bring a class action on behalf of other Whole Foods' employees because, as he testified:

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

---

[2]    Whole Foods' corporate leadership admitted that representations were made to staff members (*e.g.*, putative class members) concerning the Gainsharing bonus program at the time of hire, and that their reliance on those representations was reasonable. (Ex. F, Mueller Dep., at 149:12-150:16 ("I would expect someone to give me correct information about my wages"); Ex. C, Gearhart Dep., at 204:07-206:16; Ex. G, Wescoe Dep., at 141:04-143:16 (testifying that Whole Foods provided staff members with information concerning their compensation including "base pay, bonus, the gainsharing incentive").

[T]he people I worked with, gainsharing was make or break for them. They depended on it to pay for prescriptions for their children, for putting food on the table. They were not high-income people and they depended on every dine and every dollar that they could get their hands on.

And there were times where I – and I'm not going to name names but I actually had to borrow, lend them some money so that they could make ends meet and get medication for their children or food on the table. And then the more profitable we became the less they seemed to get, so it was kind of like . . . the more you worked the less you got, and that's not what we signed on for. So I wasn't sure what was going on but I knew something was going on.

And I didn't -- like I said, I don't care for myself. I worked at reputable companies. I've made a good living my whole life, but these people are the people that put their trust in Whole Foods that they would take care of them and they would pay them what they promised they would pay them and they did not do that.

…

It was important for me to get them their fair share.

(Ex. V at 99:15-100:19).

### 3.  *Jose Fuentes*

Fuentes began working for Whole Foods in September of 2004 as a cashier assistant team member in the Georgetown store. (Ex. W, Fuentes Dep., at 10:11-11:9). While at the Georgetown store, Fuentes worked under both Victor Vasquez (STL) and Jovi Duli (TL). (Ex. W at 12:4-16, 46:14-47:2).  He worked at the Georgetown location until approximately 2012, when he joined the Friendship Heights store as a grocery team member. (Ex. W at 12:20-13:4). At the time, the Friendship Heights grocery team leader was Dan Schumaker (Ex. W at 13:18-19). In 2014, Fuentes left the Friendship Heights store to work in the Reston store (Ex. W at at 14:15-19). Fuentes remained on the grocery team but was promoted to frozen food buyer at the Reston store. (Ex. W at 14:12-15:5). His team leader was Danny Rosenthal. (Ex. W at 15:6-9). Around 2014 or 2015, Fuentes received a promotion to dairy buyer in the Columbia store. (Ex. W at 15:17-16:7).

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

Fuentes remained on the grocery team, and reported to the team leader, Nelson Amaya, and, later, to Svetlana Bautista. (Ex. W at 16:8-16, 39:17-21). Fuentes ultimately resigned at the Columbia store in August of 2016. (Ex. W at 16:20-17:1, 19:15-16).

Fuentes learned about the Gainsharing program on the first day of employment at Whole Foods. (Ex. W at 30:6-8). Fuentes was eligible for gainsharing in each of the store locations that he worked (Ex. W at 55:7-58:1). Fuentes testified that he relied upon his team leaders to pay him the correct amount of wages under the gainsharing program. (Ex. W at 29:17-19). When referencing the Gainsharing program, Fuentes further testified that he "relied on store team leaders and company executives to do the right thing." (Ex. W at 37:16-18).

Fuentes brought this action for the benefit of himself and others similarly situated.

### 4.   Jon Pace

Jon Pace began working for Whole Foods on January 7, 2007, in its Arlington Store. (Ex. X, Pace Dep., at 19:18-20:15). He worked there until approximately October 2017. (Ex. X at 29:11-14). During his tenure with Whole Foods, Pace was a team member in the meat department. (Ex. X at 19:18-20:15). Pace worked under two of the fired *Vasquez* plaintiffs—both Ibrahima Ba and Mike Amegnaglo (also referred to as "Mike Ameg"). (Ex. X at 22:06-23:11).

When Pace first interviewed for the job with Whole Foods, he was informed about the Gainsharing program. (Ex. X at 25:20-26:17). He was told that it was "a company policy that gives money to workers based upon what they have earned and based upon what the store has earned" and that he would receive a Gainsharing payment every month if certain goals were met. (Ex. X at 25:20-26:17). He relied upon those representations and promises in accepting the job offer. (Ex. X at 62:01-19, 64:16-65:02). He turned down other employment opportunities when he accepted the position with Whole Foods. (Ex. X at 62:20-63:04).

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

Pace testified that he brought this as a class action "[f]or justice for everybody who was harmed." (Ex. X at 60:18-21).

### 5.    *Christopher Milner*

Christopher Milner worked for Whole Foods from 2002 until February 2017. (Ex. Y, Milner Dep. at 10:20-11:18). He started in Chapel Hill, North Carolina, moved to the Durham store in 2005, transferred to the P Street store in Washington, D.C. in 2007, moved to the Bethesda, Maryland, store in approximately 2007, worked in the P Street store again from 2010 until 2016, and then finished his tenure at the store in Augusta, Georgia. (Ex. Y at 10:20-11:18).

At the time Milner was hired, the Gainsharing program was explained to him, and he relied upon "the promise of Gainsharing [that] if we were into surplus," then the surplus would be paid to him and the coworkers in his department. (Ex. Y at 30:25-32:10). Milner testified that he did not believe his department's good performance matched up to the paltry Gainsharing payments he was receiving. (Ex. Y at 26:24-27:17). But he was unaware of any manipulation of labor and had no way of verifying if the Gainsharing payments were accurate. (Ex. Y at 26:24-27:17).

At the P Street store, Milner worked underneath STL Vasquez, as well as ASTLs Sadoudi and Miano. (Ex. Y at 14:17-15:11).

Milner's employment with Whole Foods ended in February 2017 because the Augusta, Georgia, store closed. (Ex. Y at 11:3-22, 18:04-22:02). Whole Foods offered him a severance of $7,647 in exchange for a general release, but he declined the severance to avoid jeopardizing his involvement in this lawsuit. (Ex. Y at 18:04-21:02). Milner explained that in addition to "looking to get the money that I feel that I was due from Whole Foods that I was not given based off of the fraud from the Gainsharing program," he brought this as a class action because he "wanted to get justice for everyone who was wronged by this . . . all the team members that have been shorted

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

and not given what they were supposed to receive because of this." (Ex. Y at 18:04-21:02, 40:12-41:02).

### B.   Background on Defendant, Whole Foods Market Group, Inc.

Whole Foods Market, Inc. is a holding company that controls several subsidiaries, which in turn own the physical stores throughout the country. Whole Foods' corporate officials do not know the difference between the various entities, and generally refer to them all as "Whole Foods." (Ex. C at 265:02-20; Ex. D at 11:10-17; Ex. E at 10:06-11:15). Nevertheless, all the entities are now owned by Amazon. (Ex. C at 265:02-20; Ex. D at 11:10-17; Ex. E at 10:06-11:15).

Defendant Whole Foods Market Group, Inc. is one of those subsidiaries that owns and operates stores throughout the country. (Ex. B at 219:14-22). Specifically, Whole Foods Market Group, Inc. owns more than 250 stores across the country, encompassing the Midwest, Northeast, North Atlantic, Mid-Atlantic, South, and Florida regions. (Ex. A at 171:02-16).

### C.   The Gainsharing Program and Corporate Oversight of Gainsharing[3]

During his deposition, Whole Foods Senior Business Analyst James Michael "Mike" Grady was responsible for investigating Gainsharing violations across the entire company. (Ex. D at 158:3-160:11). Grady admitted that at all times relevant during Plaintiffs' employment, Whole Foods' Gainsharing program provided payments to employees whose departments come in under budget. (Ex. D, Grady Dep., at 29:04-31:04; Ex. F at 112:09-113:09). In short, the program incentivized employees to increase department productivity and increase department

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

---

[3]   In the interest of efficiency for the Court and parties, and with the permission of counsel for the *Vasquez* Plaintiffs, as much of the relevant factual summary as possible (including exhibits) has been borrowed from the *Vasquez* Plaintiffs' Memorandum of Points and Authorities in Support of their Opposition to Defendants' Motion for Summary Judgment (*Vasquez* ECF No. 184-1).

revenue while minimizing/maintaining labor costs. (Ex. D at 29:04-31:04; Ex. F at 112:09-113:09). If a department came in under budget, the surplus is distributed among the employees in that department as a Gainsharing payment. (Ex. D at 29:04-31:04; Ex. F at 112:09-113:09).

To ensure labor costs were appropriately allocated to departments, if an employee ever worked in a department outside of their home department, they were required to "clock out" of their home department and "clock in" to the visiting department. (Ex. U at 71:13-74:14).

Nevertheless, as part of the Gainsharing program, STLs were instructed by their executive coordinators at the corporate office to "transfer" or "shift" labor from teams in deficits to teams in surplus irrespective of whether the team member actually worked in that department. (*See* Ex. 1, Vasquez Pls.' Ans. to Interrogs., at Nos. 1-3, and 19 [Exhibits 1(a)-1(i) and 2(a)(2(i)]). STLs learned to transfer or shift labor through their mentors (*e.g.*, Nicole Wescoe, Sam Park, and Jane Mueller), store leadership, and the executive leadership in the region. (Ex. I at 82:9-12, 31:13-35:15; *see also* Ex. J, Njie Dep., at 56:23-58:8; Ex. K, Vasquez Dep., at 136:7-139:7).

For example, on April 20, 2015, Jane Mueller sent STL Miano the following email directing him to transfer labor:

-------- Original message --------
From: "Jane Mueller (MA MAC)" <Jane.Mueller@wholefoods.com>
Date: 04/20/2015 10:48 AM (GMT-05:00)
To: "Nick Miano (MA BET)" <Nick.Miano@wholefoods.com>
Subject: FP7 Labor Deficits - IMMEDIATE ACTION NEEDED

Hi Nick – are you OK to spread the Grocery, Prep foods and WB deficits to the other teams that made labor?  We are doing this with a few stores so teams don't get too far behind.

**Jane Mueller**

**Executive Coordinator of Operations | Whole Foods Market Mid-Atlantic Region**

p: 301.452.5021| e: jane.mueller@wholefoods.com | w: www.wholefoods.com

5515 Security Lane, Suite 900, Rockville, MD 20852

(*See* Ex. 6, Mueller Email Instructing Miano to Transfer Labor[4] (highlights added)). Importantly, the subject of the email is "Labor Deficits – IMMEDIATE ACTION NEEDED." Mueller urged Miano to spread the labor costs for teams that have "deficits to the other teams that made labor[.]" (Ex. 6). Mueller then admitted that "we [those in Whole Foods' corporate office] are doing this with a few stores." (Ex. 6). Sam Park, the former Vice President of Whole Foods, testified that it would be a manipulation of the Gainsharing program to instruct a STL "to spread deficits from a team to another team" that "made labor," just as Jane Mueller requested Miano to do. (Ex. R, Park Dep., at 140:21-144:13).

This is not the only email in which Whole Foods' corporate leadership instructed STLs to transfer labor. STL Sadoudi (then an ASTL) testified that she received a cc of an email from Jane Muller directing her STL to transfer labor while she worked at the Arlington store. (Ex. S, Sadoudi Dep., at 193:7-194:21; *see also* Ex. 1(g), Sadoudi Ans. to Interrogs., at No. 3). David Gearhart, Whole Foods Director of Human Resources for the Mid-Atlantic Region, confirmed during his investigation that "we have the email." (Ex. 1(g) at No. 3). Mueller does not dispute that she sent this email to Sadoudi, (Ex. F at 122:11-124:4), yet Whole Foods never produced this email in discovery.

---

[4]    This email was not produced by Whole Foods in discovery. Mueller confirmed that she sent it but said she could not locate it. (Ex. 102 at 183:07-09). Mueller claims that she "did not intentionally delete it." (Ex. 102 at 124:6-13). She claims that she could not find the email (Ex. 102 at 125:13-16), but also explained when asked if she searched for it, "I don't know that I'd call it a search." (Ex. 102 at 124:6-20). In order to delete the email from the Whole Foods system, Mueller would have had to delete the email, then delete the deleted email in the computer's "deleted file," and then confirm that permanent deletion is desired after receiving the prompt: "Are you sure you want to delete this?" (Ex. 102 at 183:01-185:09). Mueller testified that she "could have deleted a large group of emails that were taking up room on my computer. And I could have deleted a large group of emails, that being one of them. That's very possible." (Ex. 102 at 184:19-185:09). That said, she admitted still having other emails from the time period in question. (Ex. 102 at 185:10-16).

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

Nevertheless, the corporate regional office was aware of and acquiesced to this practice, as the corporate office for Whole Foods' Mid-Atlantic region was responsible for tracking each store's performance in the region by monitoring a "weekly labor spreadsheet" and "flash recap" reports, in addition to "Gainsharing reports." (Ex. F at 96:01-97:22). An example of Ms. Mueller's close monitoring of labor deficits is attached as Exhibit 7. The weekly labor spreadsheet tracked the data for each store, "the sales, the allocated labor dollars, and the actual labor dollars and hours." (Ex. 7). In the same vein, Park testified that in his 15 years as Vice President of the Mid-Atlantic region, his region never missed labor because "we [regional leadership] monitored labor." (Ex. R at 152:01-11). Indeed, the ASTL for the Tenleytown store, Zeeshan Naqvi,[5] testified that Nicole Wescoe (then Executive Coordinator for the Mid-Atlantic Region) and Scott Allshouse (President of the Mid-Atlantic Region[6]) monitored team deficits for the stores, and if there were improper labor transfers, then both corporate executives would know of them. (Ex. H, Naqvi Dep., at 103:05-13).

Kristen May, the Vice President of Operational Finance for the Mid-Atlantic Region, explained that the corporate headquarters for Whole Foods (located in Austin, Texas, and referred to as "Global"), had a Gainsharing team that performed audits on the Gainsharing program. (Ex. E, May Dep., at 56:18-57:18). They, too, must have been aware of the labor manipulation.

In addition, the Payroll Benefits Specialist ("PBS") in each store was responsible for transferring the labor. (Exs. 1(h), 2(h), Sheikh Ans. to Interrogs., at Nos. 1, 2, 19). A PBS is located in each store as well as the regional corporate office, and "[t]heir sole focus is to process payroll

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

---

[5]    Naqvi is one of the 34 declarants that Whole Foods belatedly disclosed. *See generally* Order (December 16, 2020) [ECF No. 109]. Tenleytown is not one of the nine stores where Plaintiffs worked, but as discussed below, was revealed during Whole Foods' investigation as having "blatant[ly]," improper transfers. (Ex. 11, Hidden Columns Spreadsheet).

[6] And Rule 30(b)(6) designee of Defendant Whole Foods.

and benefits." (Ex. C at 19:01-12). The PBS, not the STL, had access to the Kronos system, Whole Foods' timekeeping software; the PBS would manually adjust the labor hours of certain employees attributed to each department, thereby shifting labor. (Ex. U at Nos. 1, 2, 19; *see also* Ex. C at 21:18-22:06). The Kronos data was then uploaded directly to Global. (Ex. C at 21:18-22:06).

Whole Foods has repeatedly admitted that every time there was a transfer of labor, a Timekeeper Transfer Form ("TTF") would need to be completed. In its *Vasquez* Counterclaim, Whole Foods repeatedly claims, "The information in the Labor Reports, and the information required in the missing TTFs, involved facts that **were key to the accuracy** of the amount and value of hours worked by the Team Members. **This information had to be accurate** because it related directly to the store's operation and the Team Members' gainsharing payment . . . **the information on the TTFs and Labor Reports needed to be accurate**." *See e.g.*, *Vasquez* Countercl. at ¶ 26 (emphasis added). Gearhart testified to the same at his deposition:

> Q   Do you agree with me that when you're shifting labor, there needs to be a contemporary TTF prepared?
>
> [objection omitted]
>
> A   To document the shifting of labor?
>
> Q   Yes.
>
> A   That is the standard operating procedure, yes.
>
> Q   That standard operating procedure, does that come from Global?
>
> A   That's the standard. I'm not sure exactly where it was put in place. My understanding is, again, because I'm not deep in the detail of payroll, that the standard operating procedure is when labor was transferred, that the TTF was created.
>
> Q   And it's your understanding that it's created because -- that it's an important document to ensure that the reporting is accurate, correct?
>
> A   It substantiates the accuracy of it, yes.

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

> Q   And without it, there's no way to show that it was accurately done? It's needed?
>
> **A   It's needed.**

(Ex. C at 129:21-131:1 (emphasis added)). Allshouse testified to the same:

> Q.   And you also -- we've established this yesterday, that the TTF was required when there was a transfer, correct?
>
> A.   That was the expectation, yes, sir.

(Ex. B at 56:16-19). Finally, counsel for Whole Foods even squarely represented the same to the Court—every time there was a transfer of labor, a TTF had to be completed. (Tr. (October 1, 2018) (ECF No. 56) at 26:24-27-12; *see also infra* Section II.E.2).[7]

Whole Foods cannot reconcile these admissions with the fact that it is missing supporting documentation, such as a TTF, for 19,013 labor transfers that occurred in the 113 stores across the country in a 3-month period and for 26,645 manual transfers throughout the Phase One Stores over a nearly three-year period.

According to Gearhart,[8] Global was responsible for overseeing the payroll data and would generate Gainsharing reports based on that data. (Ex. C at 135:14-136:07). Although Gearhart tried to pin oversight responsibility for the PBSs solely on Global, the reality is that the PBS for each store in the Mid-Atlantic region participated in periodic teleconferences once per month with Global and the regional office. (Ex. C at 190:16-195:12). Gearhart's HR team in the regional office also had monthly meetings with the PBSs throughout the Mid-Atlantic region. (Ex. C at

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

---

[7]   In addition to the foregoing admissions by Defendant, Kuczor testified that he believed the PBS was also responsible for completing a TTF each time there was a labor transfer. (Ex. V at 42:03-09). Milner confirmed the PBS' responsibility for the completion of TTFs, stating that the PBS would initiate the completion of the TTF and provide it to the team member to verify that the hours were in fact worked in the other department. (Ex. Y at 34:20-35:04).

[8]   At the time, Gearhart "was the Executive Coordinator of TMS—Team Member Services," which is essentially the HR department for the Mid-Atlantic region. (Ex. B at 27:03-10).

267:02-271:18). The PBSs working in the corporate regional office under Gearhart "oversaw, guided, and supported the PBSs in the stores throughout the region." (Ex. C at 270:05-19).

According to Whole Foods, it is a "major infraction" to charge a team member's hours to a team where he or she did not work, yet the practice of shifting labor was widespread. *Vasquez v. Whole Foods Market Inc.*, Case No. 17-cv-00112-APM, (D.D.C., May 3, 2022), Defs.' Statement of Undisputed Facts at No. 18 (ECF No. 175-92 at 3).

The shifting of labor resulted in earned wages not being paid to workers, which directly increased Whole Foods' profits (through lower labor costs). (*See* Ex. B, Allshouse Dep., at 212:02-214:04; Ex. E at 172:20-175:116; Ex. 1(c), Bautista Ans. to Interrogs., at No. 5). According to Ms. May, the result of shifting labor is that Whole Foods paid "out less money to team members," and retained more money for Whole Foods. (Ex. E at 174:21-175:16).

████████████████████████████████████████████████████

███████████████████████████████████████████████ (Ex. 27, Deloitte Call Script, at Bates 740807). ███████████████████████████

████████████████████████████████████████████ (Ex. X at Bates 740807).

Further, shifting labor positively impacted the bonuses of Whole Foods' corporate executives, including the regional president Scott Allshouse, because their bonuses were tied to the profitability of the region. (Ex. B at 214:09-21). In the same vein, the STLs' bonuses were tied to the profits of the store and Whole Foods. (Ex. E at 145:09-147:20).

**D.    Whole Foods' So-Called "Investigation" into Labor Transfers**

In October 2016, Whole Foods received an anonymous "tip line call: regarding the practice of transferring labor." (Ex. B at 26:03-27:10). This tip line complaint related to the Kentlands store headed by Pa Njie, but the tip was closed as unsubstantiated. (Ex. B at 28:12-

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

30:12). Apparently, Whole Foods believed they could just brush this issue under the rug. But the tip line reports kept coming. (Ex. B at 30:13-21). Whole Foods received three or four additional complaints about "inappropriate labor" that negatively impacted Gainsharing. (Ex. C at 32:04-11).

As a result of the tip line reports, Allshouse asked Kristen May, the Vice-President of Operational Finance for the Mid-Atlantic Region, to start an investigation. (Ex. E at 189:07-192:13). May was one of four individuals who participated in the investigation into labor transfers at the region-wide level. (Ex. E at 10:4-5, 95:1-17). May reviewed data that she received from Mike Grady, who worked at Global and analyzed that data for a certain fiscal period. (Ex. E at 87:10-17; 96:16-98:15). In the analyzing the data, May was looking for two Team Leaders ("TLs") or Assistant Team Leaders ("ATLs") who appeared in the same team. (Ex. E at 190:06-193:13). May referred to this as an anomaly or "red flag." (Ex. E at 190:06-193:13). She confirmed that two team leaders in a single team constitutes a "probable" violation of the Gainsharing policy. (Ex. E at 85:22-87:1). May generated a report the same day that she received the data from Global. (Ex. E at 190:22-13).

According to May's report (Ex. 8), of the 50 stores that she analyzed, 37 Mid-Atlantic stores had red-flagged labor transfers just for the limited time period she reviewed. (Ex. E at 110:4-111-20; Ex. 8). May reported her findings to Scott Allshouse and Dave Gearhart, and the three of them agreed it was a "pattern that was concerning." (Ex. E at 193:06-17). Amazingly, Dave Gearhart (the head of the investigation for the Mid-Atlantic Region) never considered Kristen May's analysis as part of his investigation, and he did not investigate the stores identified by May; instead, he investigated only the 10 stores where the *Vasquez* plaintiffs were working at the time of their termination. (Ex. C at 230:16-231:7).

Allshouse, the highest-ranking corporate official in the Mid-Atlantic region, confirmed that he undertook a similar approach to his investigation. (Ex. B at 35:1-37:02). Specifically, Gainsharing reports were the documents he analyzed in investigating the labor-transfer issue. (Ex. B at 227:13-229:13). In doing so, Allshouse reviewed Gainsharing reports to see if there were two TLs in a single team. (Ex. B at 37:19-38:01; 42:11-43:06; 43:22-44:08). Like May, Allshouse referred to two TLs contained in a single team as reflected in a Gainsharing report as a "red flag," (Ex. B at 227:21-22), and further testified as follows:

> Q. And you say it's a red flag. So you would agree that it's more likely than not that there was manipulation of the gainsharing program when there's two Team Leaders?
>
> [objection omitted]
>
> A. Hindsight, for sure, but prior to that, you know, I wouldn't -- I wouldn't know.

(Ex. B at 229:6-13).

As noted above, Gearhart ultimately led the investigation into labor transfers for the Mid-Atlantic. (Ex. A1, Whole Foods Dep., at 30:15-31:03). In doing so, he did not investigate every store in the region. In fact, Gearhart did not even investigate the 37 stores flagged by May. Instead, he limited his investigation to only ten stores. (Ex. B at 43:22-44:08; Ex. C at 220:01-22).

In discovery, Whole Foods produced investigative files for each of the ten stores investigated by Gearhart. (Ex. 4). Nine of the ten stores are stores where the *Vasquez* Plaintiffs worked as STLs. (Ex. 4). Gearhart stopped investigating beyond those ten stores because "Global Legal" took over the investigation. (Ex. C at 245:09-246:17). This, ███████████████████

████████████████████████████████████████████████

████████████████████ (Ex. 51).

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

Prior to abruptly ending his investigation, Gearhart created a spreadsheet that identified several stores for which investigation was "recommended" and/or "required," as well as stores that were not investigated at all:



(Ex. 12, Spreadsheet[9]; Ex. 13, Screenshot from Spreadsheet).

As stated above, Grady was responsible for investigating Gainsharing violations across the entire company for Global. (Ex. D at 158:3-160:11). Based on his and Golda Sahayam's[10] analysis of four fiscal periods (approximately four months in fiscal year 2016), Whole Foods identified 119 stores that had engaged in the practice of improperly transferring labor. (*See* Ex. 9, Grady Analysis, at 2 (Bates 53236)).

In an email presenting her conclusions, Sahayam stated that the ███████████████ ███████████████ (Ex. 9 at 2 (Bates 53236) (emphasis in original)). She further wrote that

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

---

[9]    The Microsoft Excel Spreadsheets attached as Exhibits 11 and 12 will be provided to chambers on a thumb drive.

[10]    Senior Coordinator-Enterprise Business Systems for Global.

███████████████████████████████████████████████████████

██████████████████████████████████████████ Sahayam also wrote,

███████████████████████████████████████████████████████

████████████████████████████████████████ (Ex. 9 at 2 (Bates

53236). Attached to Sahayam's email summary of her conclusions was a slide deck.  (Ex. 9 at 3-

9 (Bates 53238-53244)). According to the slide deck, ██████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

 Grady was questioned in deposition about the analysis he performed and the Excel

spreadsheet he created. (Ex. D at 174:15-187:22). When the spreadsheet was produced in

discovery by Defendant, it contained **more than 20 hidden columns** (columns A through N, as

well R through AB). One of those hidden columns is highlighted in red, and in addressing whether

inappropriate transfers took place, ██████████████████████████████ (Ex. D at

184:1-185:6) (emphasis added). A screenshot of a portion of that column is below and attached

as Exhibit 10, and for completeness, the entire spreadsheet is attached as Exhibit 11:



According to the metadata of Grady's hidden column spreadsheet, he completed his analysis on **November 23, 2016** (well before Defendant's many representations to the Court and the public about the scope of the malfeasance at issue). (Ex. D at 175:3-22).

Grady initially recommended that 57 stores be further investigated, but he ultimately concluded that 62 stores required further investigation. (Ex. D at 187:07-17). Grady's role in the investigation ended once he completed his analysis, and he has no knowledge of whether any further action was taken with respect to the 119 stores he identified. (Ex. D at 187:18-22). Grady believes that the investigation had been then handed off to the regional presidents throughout the country. (Ex. D at 224:05-12). Grady was "expecting a thorough investigation" by the regional presidents but was concerned that it was not as thorough as it should have been. (Ex. D at 237:02-243:19). Grady understood there to be a specific "Playbook" for conducting the investigations. (Ex. D at 241:02-13).

Although Grady had spent weeks looking into the data as part of his investigation, the regional presidents spent a mere **four days** during their so-called "investigation" of labor shifting,

reporting back that there were no issues of any kind in their respective regions. (Ex. D at 241:02-13). Grady expressed his concern. For instance, ████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████ ████████████████████████████████████████████ (*See* Ex. 14, 11/29/2016 Grady Email). Grady's concern that STLs would not report their own malfeasance was well founded.

According to Whole Foods, an investigation was required for each of the 119 stores identified by Grady in his spreadsheet, and Defendant further testified that each investigation was to be conducted according to the "Playbook" created by Gearhart. (*See* Ex. 15, The Playbook). According to Grady's slide deck, ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████ (*See* Ex. 15*; see also* Ex. A2 at 183:08-185:02).

According to the Playbook, ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████

Per the Playbook, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████ *See* Ex. 15). Notes like this are contained in Gearhart's investigative files for the ten stores. ██████████████████████████████████. (*See* Ex. 15).

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

**Whole Foods, however, cannot identify a single person interviewed or a single document reflecting that any such interview ever took place**, outside of the interviews conducted by Gearhart during his limited, ten-store investigation. (Ex. A2 at 79:07-16; Ex. 4).

### E.    Termination of the *Vasquez* Plaintiffs

Growing alarmed with the extent of labor transfers throughout the company revealed by Grady's analysis, it is apparent that Whole Foods ceased its efforts to investigate the nationwide labor shifting scandal and, instead, opted to scapegoat the *Vasquez* Plaintiffs. Whole Foods fired the nine *Vasquez* Plaintiffs on December 1, 2016, merely six days after distributing the Playbook to the regional presidents throughout the country, charged with investigating the 119 stores flagged by Whole Foods. (Ex. A2 at 31:14-16). Thinking that they could stanch the bleeding by sacrificing the nine *Vasquez* Plaintiffs, Whole Foods then publicly announced that the labor shifting was isolated to nine stores where only those STLs worked. (*See* Ex. 17, WASHINGTON POST Article). Indeed, it seems Whole Foods was more concerned about its investors and any corresponding lawsuits associated with nationwide fraud when Brooke Buchanan, Whole Foods' authorized spokesperson, stated that "[t]he amounts involved, though, will not be material to the company's earnings." (Ex. 16, ASSOCIATED PRESS Article).

According to Whole Foods, the *Vasquez* Plaintiffs were fired for improperly transferring hours by making "false statement[s] by representing entries on the TTFs and Labor Reports" and omitting "facts by not fully completing TTFs to accompany the Labor Reports."[11]  Whole Foods admits that improper Gainsharing manipulation occurred in the stores where the *Vasquez* Plaintiffs

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

---

[11]    *Vasquez v. Whole Foods Market Inc.*, Case No. 17-cv-00112-APM (D.D.C. March 26, 2018), Countercl. (ECF No. 34-1) at ¶¶ 23-24, 31-32, 40-41, 47-48, 57-58, 65-66, 73-74, 81-82, and 90-91.

worked,[12] leading to financial and other harms to Plaintiffs and other employees over the years. Defendant denies such wrongdoing happened outside of those nine stores. The evidence overwhelmingly suggests otherwise.

The nine *Vasquez* Plaintiffs collectively worked more than 138 years in more than 30 different Whole Foods Stores.[13] *See Vasquez v. Whole Foods Market Inc.*, Case No. 17-cv-00112-APM (D.D.C. May 3, 2022), *Vasquez* Plaintiffs' Opp. to Def.'s MSJ at 3-4 (ECF No. 184-1). At the time of their termination, the *Vasquez* Plaintiffs worked at the following stores: Vasquez worked in the P Street store in Washington, D.C.; Bautista worked in the Columbia, Maryland, store; Ba worked in the Arlington, Virginia, store; Miano worked in the Old Town, Alexandria, Virginia, store, Njie worked in the Kentlands, Maryland, store; Sheikh worked in the Reston, Virginia, store; Sadoudi worked in the Vienna, Virginia, store; Amegnaglo worked in a separate Arlington, Virginia, store; and Berger worked in the Charlottesville, Virginia, store. *Id.*

Not only do these former STLs admit that improper labor shifting occurred throughout the country, including other stores at which they worked; discovery has revealed that the illicit practice was widespread. (Ex. 1(a-i), *Vasquez* Plaintiffs' Answers to Defendant's Interrog. No. 2).

---

[12]    *Id.*; *see also Vasquez v. Whole Foods Market Inc.*, Case No. 17-cv-00112-APM (D.D.C. May 3, 2022), Whole Foods' Statement of Facts (ECF No. 175-92).

[13]    The Vasquez Plaintiffs worked at the following stores: (1) P Street in Washington, D.C.; (2) Georgetown;   (3) Columbia, Maryland; (4) Chevy Chase, Maryland; (5) Kentlands/ Gaithersburg, Maryland; (6) Tenley Town, Maryland; (7) Silver Spring, Maryland; (8) Rockville, Maryland; (9)  Bethesda, Maryland; (10) Alexandria, Virginia; (11) Arlington, Virginia; (12) Crystal City, Virginia; (13) Fairfax, Virginia; (14) Reston, Virginia; (15) Tyson Corner, Virginia; (16) Springfield, Virginia; (17) Charlottesville, Virginia; (18) Mason, Ohio; (19) Cincinnati, Ohio; (20) Columbus, Ohio; (21) Cleveland, Ohio; (22) Portland, Oregon; (23) Richardson, Texas; (24) Long Beach, CA; (25) Tustin, CA; (26) Phoenix, AZ;   (27) Chandler, AZ; (28) Jamboree, California; (29) Scottsdale, Arizona; (30) Southern Pacific Regional Office; (31) Seattle, Wa.; (32) Devon, Pa; and (33) North Wales, PA. *See Vasquez v. Whole Foods*, Case No. 17-cv-00112-APM, (D.D.C., April 17, 2017), Second Amended Complaint at ¶¶ 9 (ECF No. 16-2); *see also See Vasquez v. Whole Foods*, Case No. 17-cv-00112-APM, (D.D.C., June 30, 2022), *Vasquez* Pls.' Opp. to MSJ at 3-4 n. 2-10 (ECF No. 184-1) (citing to *Vasquez* Pls.' Ans. to Interrog.).

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

### F.    Whole Foods Hires Deloitte to Cover Up the Scope of its Misconduct; It Backfires

Whole Foods has claimed to this Court—and publicly—that improper labor transfers occurred only in the nine stores where the *Vasquez* Plaintiffs worked. But that is untrue. Although Whole Foods proclaimed that it conducted a "company-wide investigation" and that "this manipulation only happened in nine of our locations," one day after the AP article (Ex. 16) was printed, Whole Foods hired Deloitte to conduct an investigation into labor transfers. (Ex. 21, Deloitte Engagement Letter (December 14, 2016). Anthony Campanelli, a partner at Deloitte, led the investigation. (Ex. P1, Campanelli Dep. 2021, at 15:12-16).

#### 1.    The Payment Analysis for the Nine Stores

The purpose of initially hiring Deloitte in December of 2016 was to "focus in on the original nine stores" where the *Vasquez* Plaintiffs worked, "to look to identify or assess whether there was supportable documentation for the transfers, for the manual transfers recorded in the Kronos data for the period of fiscal year '14 to fiscal year '16, assess them into whether there is supportable information or not supportable information or no documents." (Ex. P2, Campanelli Dep. 2022, at 17:17-19:02). Deloitte analyzed Kronos data for "manual" transfers that occurred in the Kronos systems (*e.g.,* a manual, after-the-fact modification in the Kronos timekeeping software, as opposed to a transfer that is automatically recorded when an employee "clocks in" or "clocks out" of a team). (Ex. P1 at 402:14-403:1). Campanelli and his team of "around 25 or so" people at Deloitte then analyzed whether transfers of labor could be "supportable" with a TTF. (Ex. P1 at 361:19-362:9). Campanelli further performed a "payment analysis to those [employees] that may have been impacted." (Ex. P1 at 361:19-362:9).

Deloitte performed a common methodology for this "Gainsharing calculation analysis" for each of the nine stores over 39 fiscal periods, plus three additional fiscal periods for what is

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

referred to as the "stub period."[14] (Ex. P1 at 203:04-206:03 (describing the common methodology used to determine how much money needed to be paid back to employees in the nine stores who were victimized by the wrongful labor shifting)).

Once the unsupportable transfers were found, Campanelli performed the calculations necessary to determine how those transfers impacted the Gainsharing program—in other words, which employees had been shortchanged, and by how much. (Ex. P1 at 203:4-11). Once the owed wages were determined, Deloitte next calculated how the unpaid wages impacted the overtime wages that were due (the "overtime adjustment" or "OTA").[15] (Ex. P1 at 204:4-10). After the principal payment and OTA was calculated, an "enhancer"—a 3.96 % interest rate arbitrarily chosen by Whole Foods and based on the Treasury rate—was added to each victimized employee's payment. (Ex. P1 at 231:6-9, 232:14-15, 233:11-234:9).[16] Ultimately, Campanelli created spreadsheets for each of the nine stores, identifying the names of every employee who was owed money and the total amount owed and paid through the common methodology he employed. (Ex. P1 at 209:6-210:10; 416:05-421:06; *see also* Exs. 34-50).

A summary of calculations for each of the nine stores is below:



---

[14]  The "stub period" refers to fiscal periods 1 through 3 of fiscal year 2017. (Ex. P at 53:08-54:07). The stub period was added to calculate all payments owed for the three years leading up to December of 2016. (Ex. P at 36:16-37:01, 53:08-54:07).

[15]  Such an adjustment was legally necessary under 29 C.F.R. § 778.109; it did not—and was not intended to—include any of the other compensation required under the law for wage and hour law violations.

[16]  Of course, the analysis was only performed, and the payments offered, **after** this lawsuit was filed; even then, the "enhancer" falls well short of the damages owed to the employees under the DCWPCL and the Maryland Wage Payment law.

[17]  Each of the stores are listed twice, except for Old Town, because Deloitte went back and calculated the "stub period" which was fiscal periods 1 through 3 of fiscal year 2017. (Ex. P2 at 53:08-54:07).

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030



(Exs. 34-50.)  Deloitte did not perform this payment analysis for any store other than the nine

stores where the *Vasquez* Plaintiffs worked. (Ex. P2 at 21:20-24:01).

These payments fall well short of what the law requires. *See, e.g.*, D.C. CODE § 32-1308

("liquidated damages equal to treble the amount of unpaid wages" plus "costs of the action,

including costs or fees of any nature, and reasonable attorney's fees"); MD. CODE ANN., LAB. &

EMPL. § 3-507.2 ("the court may award the employee an amount not exceeding 3 times the wage,

and reasonable counsel fees and other costs.").

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

### 2.    Nationwide Unsupportable Transfer Analysis

In March 2017, Deloitte's engagement expanded to include an analysis of the 113 stores[18] and the Phase One stores.[19] (Ex. P2 at 35:08-37:11, 181:09-182:01). It was not until nearly three and one-half years after the filing of this lawsuit that Defendant, through Deloitte, began completing its investigation into the 113 stores and the Phase One stores. (*See* Ex. 23, Deloitte Analysis as of April 17, 2020). ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ (Ex. 52).

Before turning to the data, it is worth noting that Campanelli' and Deloitte's role was not to conduct an independent investigation. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████. (Ex. P2 at 144:17-146:18; *see also* Ex. 26, Deloitte Notes). In other words, Whole Foods brought in Deloitte to try to whitewash the

---

[18]    These are the 113 stores for which the Court compelled Whole Foods to produce TTFs. *See Vasquez v. Whole Foods Market Inc.*, Case No. 17-cv-112-APM (D.D.C. April 10, 2019, Order (ECF No. 61).

[19]    Alexandria, VA (Old Town); Annapolis, MD; Arlington, VA; Bethesda, MD; Chandler, AZ; Charlottesville, VA; Cincinnati, OH; Cityline, TX (Richardson); Cleveland, OH; Columbia, MD; Deerfield, IL; Devon, PA; Dublin, OH (Columbus); Durham, NC; Fair Lakes, VA; Foggy Bottom, DC; Friendship Heights, MD; Georgetown, DC; H Street, DC; Harbor East, MD; Jamboree, CA (Tustin); Kentlands, MD (Gaithersburg); Long Beach, CA; Mason, OH; Mount Washington, MD; North Wales, PA; P Street, DC; Palantine, IL; Pentagon City, VA; Phoenix, AZ; Portland, OR; Reston, VA; Riverdale; Rockville, MD; Roosevelt Square, WA; Silver Spring, MD; Southern Pacific Regional Office; Springfield, VA; Tenleytown, DC; Tysons Corner, VA; Vienna, VA.

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

internal investigation conducted by Whole Foods that found labor transfers in 119 stores. It did not go as planned for Whole Foods.[20]

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████

         ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ █████████████████████████████

─────────────────

[20] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

[21]    Deloitte analyzed a three-year period for the nine stores and the Phase One stores, but only a three-month period for the 113 stores which explains why there were fewer total months analyzed for the 113 stores.

[22]    Plaintiffs also analyzed the manual transfers occurring in the Phase One stores to determine if the transfers were supported by a corresponding TTF. (Zambri Decl. ¶ 11). Of the Phase One Stores for which Whole Foods produced TTFs, only 7.8% of the identified transfers were adequately supported by a TTF. (Zambri Decl. ¶ 11). For example, the office of undersigned counsel found that 95.5% of the transfers in the White Flint store identified did not have supporting TTFs. Similarly, 91.2% of the transfers in the Annapolis Store did not have supporting TTFs, and 94.2% of the transfers for the Mt. Washington store were unsupported.



.

Furthermore, the number of unsupportable transfers (and undocumented transfers) per month was significantly higher in the 113 stores than the nine stores—**40.29 unsupportable transfers per month for the nine stores** versus **62.13 unsupportable transfers per month for the 113 stores.** (*See* Ex. 23 at Bates 740374; *see also* Ex. P2 at 246:16-250-02 (confirming the mathematical calculation to determine the per month number of transfers)). Thus, based on the objective data, there were more unsupported transfers per month in the 113 stores versus the original nine stores.

The supportable/unsupportable analysis performed by Deloitte for purposes of calculating Gainsharing payments owed to workers at the nine stores is consistent with Whole Foods' representations during this lawsuit. Whole Foods sued the *Vasquez* Plaintiffs for missing and/or allegedly false TTFs.[23]  Whole Foods has further insisted in this litigation that "you actually need to go and look at the TTF, the time transfer forms . . . *in order to actually see whether there was improper gainsharing – shifting, you have to look at both sets of documents together*" (Tr. (October 1, 2018) 26:24-27-12) (ECF No. 56)). Based on those representations by Whole Foods, that was the framework in which discovery was conducted over the past four years. To determine if there were improper labor shifting, one looks to see if there is a TTF that supports the transfer.

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

---

[23]   *See* Vasquez Countercl. at ¶¶ 21, 23-26, 30-35, 39, 41-44, 50-53, 58-61, 64, 66-69, 72, 74-77, 81-86, 91-94 [ECF 34-1].

This was the analysis performed by Deloitte, and it is the analysis performed by Plaintiffs after moving to compel production of the TTFs. Moreover, and despite Defendant's stubborn insistence otherwise, Deloitte's analysis indisputably identified improper labor transfers that impacted Gainsharing in stores other than those where the *Vasquez* Plaintiffs worked.

## III.   PROPOSED CLASS

Plaintiff moves for class certification against Whole Foods as to the following claims: (1) breach of contract and breach of the duty of good faith and fair dealing (Count I); (2) unjust enrichment (Count II); (3) failure to pay wages upon discharge in violation of D.C. Code § 32–1303 (Count III); (4) failure to pay wages in violation of D.C. Code § 32–1302 (Count IV); (5) failure to maintain accurate employment records in violation of D.C. Code § 32–1008 (Count V); (6) failure to pay wages upon discharge in violation of Md. Code § 3–504 (Count VI); (7) failure to pay wages in violation of Md. Code § 3–502 (Count VII); (8) failure to inform of wages in violation of Md. Code § 3–504 (Count VIII); and (9) fraud (Count XI).

Plaintiff proposes that the Class consist of past and present employees of Whole Foods who were not paid wages owed to them under the Gainsharing program. And while the definition of the class is unchanged as set forth in the Second Amended Complaint, in light of the Court's dismissal of Whole Foods Market Inc., "Whole Foods" as defined by this motion pertains to Whole Foods Market Group, Inc., not Whole Foods Market, Inc.[24] Because Whole Foods Market

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

---

[24]   To the extent that it is required in light of the dismissal of Whole Foods Market, Inc. Plaintiffs respectfully request leave of Court to amend the definition of the Class as initially set forth in Plaintiffs' Second Amended Complaint. Under FED. R. CIV. P. 23(c)(1)(C), a court may amend the definition of the class at any time in the case. Having the benefit of discovery, the Class definition in this Motion reflects the evidence and claims in this case with more precision. *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014); *see also In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2014).

Group, Inc. only encompasses stores in the Midwest, Northeast, North Atlantic, Mid-Atlantic, South, and Florida regions, the proposed class is necessarily limited to the stores contained in those regions.

Under FED. R. CIV. P. 23(c)(5), Plaintiff proposes that the Class be divided into the following sub-classes:

> a.    Past and present employees of Whole Foods who were employed in the District of Columbia and did not receive all earned wages at least twice during each calendar month on regular paydays in violation of the District of Columbia Wage Payment and Collection Law.

> b.    Past employees of Whole Foods who were employed in the District of Columbia and were not paid all earned wages within seven days after resignation or termination.

> c.    Past and present employees of Whole Foods who were employed in the State of Maryland and did not receive all earned wages at least once in every two weeks or twice in each month on regular paydays, in violation of MD Code, Labor and Employment, § 3–502.

> d.    Past employees of Whole Foods who were employed in the State of Maryland and were not paid all earned wages for work that the employee performed before the termination of employment, on or before the employee's next anticipated payday, in violation of MD Code, Labor and Employment, § 3–505.

> e.    Past and present employees of Whole Foods who were employed in the State of Maryland and were not at the time of their hiring provided full and accurate notice of their rates of pay, in violation of MD Code, Labor and Employment, § 3–504; and,

> f.    Past and present employees of Whole Foods who accepted employment from Whole Foods in reliance on the promised compensation (including Gainsharing payments) but did not receive the promised payments.

## IV.    ARGUMENT

### A.    Legal Standard for Certification under Rule 23

"Under the Federal Rules of Civil Procedure, a class can be certified if it meets Rule 23(a)'s four requirements—numerosity, commonality, typicality, and adequacy of representation—and if it falls into one of the three categories of class actions described in Rule 23(b)." *In re Veneman*, 309 F.3d 789, 792 (D.C. Cir. 2002) (citing FED. R. CIV. P. 23; *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–16 (1997)).

### B.    The Court should certify the proposed Class because (1) Rule 23(a) is satisfied and (2) common questions of law and fact predominate over individual ones and a class action is the superior method of adjudication.

#### 1.    Plaintiffs and the proposed Class satisfy all requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation.

Federal Rule of Civil Procedure 23(a) delineates four necessary prerequisites to class certification:

> (a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> > (1) the class is so numerous that joinder of all members is impracticable;
> >
> > (2) there are questions of law or fact common to the class;
> >
> > (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> >
> > (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a). "These requirements are known respectively as 'numerosity, commonality, typicality, and adequate representation.'" *Artis v. Yellen*, 307 F.R.D. 13, 24 (D.D.C. 2014) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011)). In this case, Plaintiffs and the proposed class satisfy each requirement; they will be discussed in turn.

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

### a.    Rule 23(a)(1):  Numerosity

The proposed Class meets Rule 23's numerosity requirement. As a prerequisite for class certification, Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23. "'Impracticability of joinder means only that it is difficult or inconvenient to join all class members, not that it is impossible to do so.'" *Coleman through Bunn v. D.C.*, 306 F.R.D. 68, 76 (D.D.C. 2015) (quoting *Bond v. Fleet Bank,* No. 1–177, 2002 WL 31500393, at *4 (D.R.I. Oct. 10, 2002)). Although courts have eschewed drawing firm lines on numerosity, as Judge Sullivan has observed, at least a few "rules of thumb" can be divined—with 25-30 class members, there should arguably be a presumption that the numerosity requirement has been met; moreover, "[a]bsent unique circumstances, 'numerosity is satisfied when a proposed class has at least forty members.'" *Coleman*, 306 F.R.D. at 76 (quoting *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 196 (D.D.C. 2013)) (citing *Alvarez v. Keystone Plus Construction Corp.*, 303 F.R.D. 152, 160 (D.D.C. 2014)); *see also Cohen v. Chilcott*, 522 F. Supp. 2d 105, 114 (D.D.C. 2007) ("Courts in this District have generally found that the numerosity requirement is satisfied and that joinder is impracticable where a proposed class has at least forty members.").

In this case, numerosity does not pose a hurdle to class certification. It is not a close call. As set forth above, (*see supra* Sec. II.F.1), there are **5301 employees in just the nine stores** who lost Gainsharing payments as a result of the practice of labor transfers, which is on average 589 employees per store. Applying that average to the approximately 250 stores owned and operated by Whole Foods Market Group, Inc., there are approximately 147,250 employees that are putative Class members. Given that the impacted employees number in the many thousands, the putative Class easily satisfies Rule 23(a)'s numerosity requirement.

### b.    Rule 23(a)(2):  Commonality

The putative Class also meets Rule 23's commonality requirement. As a prerequisite for class certification, Rule 23(a)(2) requires that there be "questions of law or fact common to the class." FED. R. CIV. P. 23. "[C]ommonality requires that plaintiffs advance a 'common contention' that 'must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Cobell v. Salazar*, 679 F.3d 909, 922 (D.C. Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). "'The commonality test is met when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members,' such that 'factual variations among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members.'" *Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 160–61 (D.D.C. 2014) (quoting *Chilcott*, 522 F. Supp. 2d at 114). Commonality does not require identical factual scenarios for every class member; it requires only that the class members "have suffered the same injury." *Wal-Mart*, 564 U.S. at 350. Plaintiffs need only show that one issue is common to all proposed class members. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

In this case, putative Class members' claims share common facts, legal theories, and injuries, all of which can be addressed by a uniform remedy. The proposed Class consists of former and current Whole Foods' employees who as a result of labor transfers were not paid their earned and owed Gainsharing wages.

The common issue for each of the putative Class members is whether there were unsupported labor transfers in their respective stores. As discussed above, both Whole Foods and Deloitte have already answered this question. Specifically, Grady analyzed a three-month period for stores across the country and identified 119 stores with unsupported labor transfers. His

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

colleague, Sahayam, succinctly summarized Grady's analysis, stating that the "issue seems to be **spread across regions** at WFM." (Ex. 9 at 2 (Bates 53236) (emphasis in original)). Sahayam wrote that ***"62 stores are 'red'—these are stores that almost certainly moved labor across product teams to increase gainsharing*."** (Ex. 12 at 2 (Bates 53236) (emphasis added)). She further stated, "[w]e have also flagged an additional 57 stores as 'orange'—these are stores that moved labor, and increased gainsharing as a result, but we are unsure if this was intentional." (Ex. 9 at 2 (Bates 53236). In a wage case (such as this one) it does not matter whether the failure to pay wages was intentional or unintentional—the only question is whether the wages were paid when owed.

Furthermore, to determine how much was owed to workers in the nine stores where the *Vasquez* Plaintiffs worked at the time of their firing, Deloitte first analyzed whether the manual labor transfers in those stores had supporting documentation. (Ex. P2 at 17:17-19:02). Deloitte then recalculated the Gainsharing wages for the employees impacted by the unsupported transfers and made payments to the victims of the Gainsharing manipulation. (Ex. P2 at 17:17-19:02, 205:15-207:09).

Once it completed the payment analysis to determine the amount of Gainsharing payments owed to the various employees, Deloitte then performed the same exact supported/unsupported analysis in 113 of those 119 stores identified by Grady for a three-month period. That analysis performed by Deloitte in the 113 stores was exactly the same (common) as the analysis it did for the nine stores, with the single exception that Deloitte never continued through to the next step: calculating the precise amounts owed to the workers in those other stores.

And with respect to the fraud claim, there are two commons issues. *First*, there is a fundamental dissonance between the positions Whole Foods is attempting to take with the Court

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

- 34 -

in this case and the *Vasquez* case. In *Vasquez*, Whole Foods counterclaimed by on the basis that

the *Vasquez* plaintiffs had allegedly committed fraud by falsifying TTFs and/or otherwise failing

to complete TTFs for labor transfers. Whole Foods claimed that the "accuracy of the TTFs and

Labor Reports . . . were [sic] integral to whether Team Members received gainsharing payments."

(*Vasquez* Countercl. at ¶¶ 26, 100). If, according to Whole Foods, missing or inaccurate TTFs

constitute fraud, then the 19,013 unsupported transfers in the 113 stores also constitutes fraud.

*Second*, staff members were informed about the Gainsharing program during their job interviews

and were also provided the "Benefits: Orientation Training" handbook attached as Exhibit 33. By

accepting employment with Whole Foods after receiving the details of the compensation,

including wages to be earned through the Gainsharing program, each putative class member relied

upon the misrepresentations made by Whole Foods concerning the Gainsharing program.

The only issues that remain are to: (1) analyze a three-year period rather than just a three-

month period for the 113 stores; and (2) calculate the amounts owed to workers in those 113

stores, which can be accomplished by straightforward post-certification merits discovery. With

respect to the nine stores, no further discovery is needed. The identities of the impacted employees

in the nine stores and the amounts owed are not in dispute.

### c.    Rule 23(a)(3):  Typicality

Rule 23's typicality requirement is also met. As a prerequisite for class certification, Rule

23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the

claims or defenses of the class." FED. R. CIV. P. 23. "The typicality and commonality requirements

tend to merge." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 257 (D.D.C. 2002). Unlike the

commonality requirement, which considers the shared characteristics of the class as a whole, "the

typicality inquiry focuses on the desired attributes of the class representative." *Alvarez*, 303 F.R.D.

at 161 (citing WILLIAM B. RUBINSTEIN, NEWBERG ON CLASS ACTIONS § 3:31 (5th ed. 2013)).

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

"[T]he typicality requirement 'is satisfied if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability.'" *Alvarez*, 303 F.R.D. at 161 (quoting *Pigford v. Glickman*, 182 F.R.D. 341, 349 (D.D.C. 1998)). Typicality does not require that "products purchased, methods of purchase, or even damages of the named plaintiffs must be the same as those of the absent class members." *In re Vitamins Antitrust Litig.*, 209 F.R.D. at 261 (D.D.C. 2002). In addition, the typicality "requirement has been liberally construed by courts." *Id.* at 260.

As set forth above in the preceding subsection ("Commonality"), Plaintiffs' claims arise out of the same uniform conduct of Whole Foods—labor transfers without supporting documentation (which multiple representatives of Defendant have admitted to more likely than not be wrongful). Each of the named Plaintiffs' received payments from Whole Foods as a result of the unsupported labor transfers showing they suffered an injury. The fact that Plaintiffs are five of the 5,301 employees identified by Whole Foods that were paid back wages owed to them underscores that their claims are typical of the class.

### d.    Rule 23(a)(4): Adequacy of Representation

Plaintiffs meet Rule 23's adequacy-of-representation requirement. As a prerequisite for class certification, Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23. This element "'is satisfied upon a showing that (1) there is no conflict of interest between the proposed class representative and other members of the class, and (2) the proposed class representative will vigorously prosecute the interests of the class through qualified counsel.'" *Alvarez*, 303 F.R.D. at 161 (quoting *Encinas v. J.J. Drywall Corp.*, 265 F.R.D. 3, 9 (D.D.C. 2010)); *see also Twelve John Does v. District of Columbia,* 117 F.3d 571, 575 (D.C. Cir. 1997).

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

In this case, the named Plaintiffs will fairly and adequately represent the interests of the Class. Nothing in the record so much as suggests that there might be a conflict of interest between them and other members of the Class. To the contrary, their interests are perfectly aligned with those of the other members of the Class. They seek the same redress to which all Class members are entitled—earned Gainsharing wages, liquidated damages, punitive damages, and attorneys' fees. Furthermore, Plaintiffs have already demonstrated their allegiance to—and desire to vigorously prosecute—the best interests of the Class as a whole. Plaintiffs have aggressively prosecuted this lawsuit for over six and one-half years on behalf of the Class, proving their loyalty by placing the Class's interests above their own. Each of the Plaintiffs testified that they were seeking justice for every worker that was harmed by Whole Foods' practice of improper labor shifting. (*See supra* § II.A; *see e.g.* Ex. V at 99:15-100:19 (I don't care for myself . . . . It was important for me to get them their fair share.") and Ex. Y at 18:04-21:02 (Milner rejecting severance of $7,647 to pursue this case on behalf of others)).

Among other things, Plaintiffs have reviewed pleadings, participated in discovery with counsel, and sat for depositions. Plaintiffs have fairly and adequately represented the interests of the Class up to this point; they will continue to do so in the future. In addition, as set forth below, (*see infra* § IV.D), Plaintiffs are represented by qualified, experienced counsel who will vigorously prosecute this case on behalf of the Class. (*See also* Zambri Decl.)

### 2.    The Class should be certified under Rule 23(b)(3) because common questions of law and fact predominate over individual ones and a class action is the superior method of adjudication.

Rule 23(a)'s prerequisite prongs guide the Court on the question of whether a class **may** be certified. Having determined that certification is permissible under Rule 23(a), to answer the question of whether a class **should** be certified, the Court must look to Rule 23(b). As Rule 23(b)(3) explains,

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

A class action may be maintained if Rule 23(a) is satisfied and if:

\*\*\*

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3). In sum, under Rule 23(b)(3), a class action should be certified when the court finds that (1) common questions of law or fact predominate over individual issues and (2) a class action would be superior to other methods of resolving the controversy.

### a.    *Predominance*

Rule 23(b)(3)'s first factor, predominance, "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997). In this case, common questions readily predominate over those affecting only individual Class members.

The predominance inquiry is a two-step analysis—the characterization step and the weighing step. This Court has explained it as follows:

First, the court must "characterize the issues in the case as common or individual ... primarily based on the nature of the evidence." *Id.* "Evidence is considered 'common' to the class if the same evidence can be used to prove an element of the cause of action for each member," but evidence is individualized when "members of the proposed class would need to present evidence that varies from person to person." *Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 22 (D.D.C. 2012). Second, the court must "compare the issues subject to common proof against the issues subject solely to

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

individualized proof to *assess* whether the common issues predominate." 2 NEWBERG ON CLASS ACTIONS § 4:50 (5th ed. 2020). This comparison is "more of a qualitative than quantitative" concept. *Id*. At this weighing step, the court must keep in mind that "common liability issues are typically far more important and contested and the individual damage calculations often formulaic." *Id*. § 4:54 (5th ed. 2020); *see also In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015) ("Where common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." (cleaned up)). **"[T]he mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification."** *McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984); *see also* 2 Newberg on Class Actions § 4:54 (5th ed. 2020) ("[C]ourts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations.").

*Harris v. Med. Transportation Mgmt., Inc*., No. 17-CV-01371 (APM), 2020 WL 5702085, at *8 (D.D.C. Sept. 24, 2020) (emphasis added).

In this case, common questions of law and fact predominate over individual ones. As explained above, (*see supra* Sec. IV.A.1.b), the Class members' claims share a number of common questions of law and fact. The issue of predominance is "related to the commonality factor in that 'plaintiffs must show that the common issues identified by the Court above as sufficient under Rule 23(a)(2) predominate over any non-common issues.'" *Alvarez*, 303 F.R.D. at 162 (quoting *Chilcott*, 522 F. Supp. 2d at 116).

This case is a prototypical example of one in which "'common liability issues are [] far more important and contested and the individual damage calculations often formulaic.'" *Harris*, 2020 WL 5702085, at *8 (citing 2 NEWBERG ON CLASS ACTIONS § 4:54). Each Plaintiff, like each Class member, was deprived of his or her rightfully earned wages as a result of Whole Foods' manipulation of its Gainsharing program by illicitly shifting labor. Accordingly, virtually every single piece of liability evidence is common. Damages, while individualized in the sense that

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

different people will be entitled to different numbers, are arrived at by the application of the same, purely mathematical analysis for every Plaintiff and Class member. And again, there need be no speculation on this point, because Mr. Campanelli and his colleagues already performed the necessary analysis for nine stores, through a common methodology that calculated the individual harms inflicted by Whole Foods' common malfeasance.

Similarly, with respect to Plaintiffs' fraud claim, all Class members were harmed by the same misconduct by Whole Foods: reliance on misrepresentations made to them on behalf of Whole Foods regarding how they would be compensated, including in the "Benefits: Orientation Training" handbook. (Ex. 33). As the Advisory Committee has explained, fraud cases are classic examples of cases in which common issues predominate over individual ones:

> The court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the questions affecting individual members. It is only where this predominance exists that economies can be achieved by means of the class-action device. **In this view, a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.**

FED. R. CIV. P. 23 advisory committee notes (emphasis added); *see also Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."). In sum, in this case, common questions of law and fact predominate over individual ones.

### b. *Superiority*

The purpose of the superiority requirement is to "ensure that resolution by class action will achieve economies of time, effort, and expense as well as promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

undesirable consequences." *Alvarez*, 303 F.R.D. at 162 (internal quotations omitted); *see also* FED. R. CIV. P. 23 advisory committee notes (same). In this case, a class action is superior to other available methods of adjudication.

A class action is "the superior mechanism to other types of litigation" when "many individuals have small claims, and otherwise would not be incentivized to pursue them." *Alvarez*, 303 F.R.D. at 162 (citing *Amchem*, 521 U.S. at 617). The Supreme Court has cited with approval the following pertinent language from the Seventh Circuit:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem*, 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (1997)).

This case is the quintessential "superiority" case. The putative Class encompasses 5,301 employees in just the nine stores (Exs. 34-50), and likely in the realm of another 147,250 employees (taking the average of 589 employees per store and multiplying that average to the approximately 250 stores owned and operated by Whole Foods Market Group, Inc.). Moreover, the average amount paid back by Whole Foods at the nine stores for which Deloitte performed the necessary calculations was $87.09. Accordingly, the Class members' claims are small enough that they might rationally deem the claims not worth pursuing outside of the class action context as the filing fees alone would exceed the potential recovery. This is more so given the asymmetries of wealth and power between the putative plaintiffs (ordinary grocery workers, many of them earning just above the minimum wage) and Whole Foods (owned by Amazon, one of the most powerful companies in the world).

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

- 41 -

Requiring the Class members to file individual lawsuits would needlessly waste judicial resources, as well, given that each would have to put on identical evidence of Whole Foods' wrongdoing. In addition to this increased cost, such individualized litigation carries with it the risk of disparate results and affords no guarantee that each Class member will obtain the relief to which he or she is entitled. For the foregoing reasons, in this case, a class action is superior to other available methods for fairly and efficiently adjudicating the putative Class members' claims.

### C.    The Court should approve the Rule 23 Notice and order Defendant to produce class discovery.

When a class has been certified under Rule 23(b)(3), Rule 23 instructs that "the Court shall direct to the members of the Class the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort." FED. R. CIV. P. 23(c)(2)(B).

Plaintiffs' proposed notice to the Class, attached as Exhibit 1 ("Notice"), is reasonable and satisfies the requirements of Rule 23. Specifically, the Notice shall be distributed to each Class member (as identified by Defendant Whole Foods' records) by the following means: (1) Plaintiffs' Counsel will send the Notice by first-class mail at Plaintiffs' Counsel's expense and (2) Plaintiffs' Counsel will email the Notice. Such individualized mailing has been recognized as the best notice that can practicably be given to absent class members. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175 (1974); *Grunin v. International House of Pancakes*, 513 F.2d 114, 121-22 (8th Cir. 1975).

In addition, as required by Rule 23(c)(2)(B), the Notice clearly and concisely informs the putative Class members (i) of the nature of the action; (ii) of the definition of the Class that has been certified; (iii) of the Class claims, issues, or defenses; (iv) that a Class member may enter an appearance through an attorney if the member so desires; (v) that the Court will exclude from the

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

- 42 -

class any member who requests exclusion; (vi) of the time and manner for requesting exclusion; (vii) of the identification of Class Counsel; and (vii) of the binding effect of a class judgment on members under Rule 23(c)(3). The Notice also comports with this Court's Local Civil Rule 23.1(c).

In addition, in order to give the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," Plaintiffs request that the Court order Defendant Whole Foods to produce a complete list of every individual who worked for Defendant Whole Foods during the January 1, 2012, through December 31, 2016. Plaintiff further submits that the Court should order that the Class List be provided within sixty (60) days of entry of the Certification Order and include the last known mailing address, telephone number, and email address for each Class member.

Furthermore, Plaintiffs' Counsel requests that the Court allow them sixty (60) days from the entry of the Certification Order by which to establish a website containing the Certification Order, Plaintiffs' Second Amended Complaint, Whole Foods' Answer to the Complaint, the Notice, and important developments concerning the Class.

### D.    The Court should appoint Regan Zambri Long PLLC to serve as Class Counsel.

A court certifying a class generally must appoint class counsel. *See* FED. R. CIV. P. 23(g)(1)(A). The Rule sets forth several factors for courts' consideration: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class. *See* FED R. CIV. P. 23(g)(1)(A). Plaintiffs request that Regan Zambri Long

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

PLLC ("Plaintiffs' Counsel") be appointed to serve as Class Counsel. Plaintiffs' Counsel satisfy FED. R. CIV. P. 23(g)(1)(A).

First, Plaintiffs' Counsel has demonstrated a commitment to advancing the Class's claims. Plaintiffs' Counsel have represented Plaintiffs for over six years. (Zambri Decl. ¶ 2). Over the past six years, Plaintiffs' Counsel have spent more than two thousand three hundred (2,300) hours investigating and prosecuting Plaintiffs' claims, as well as those of the putative Class members. (Zambri Decl. ¶¶ 2-13). Plaintiffs' Counsel have engaged in extensive discovery, which included approximately 27 depositions. (Zambri Decl. ¶ 10). Plaintiffs' Counsel aggressively pursued class discovery, which resulted in the Court ordering Whole Foods to produce the Deloitte analysis that answered a key question in this lawsuit—which stores across the country engage in unsupported, improper labor shifting. (Zambri Decl. ¶ 9).

Second, Plaintiffs' Counsel have significant experience handling class actions and other complex federal litigation. Plaintiffs' Counsel also have substantial knowledge of the applicable law in such cases. Regan Zambri Long PLLC has an accomplished, dedicated practice to consumer justice in complex litigation. (Zambri Decl. ¶¶ 14-15). For example, Regan Zambri Long PLLC was appointed co-lead counsel in the consolidated action for the 2009 Metro Red Line crash. (Zambri Decl. ¶ 16). It again served as co-lead counsel in the consolidated action concerning the 2015 Metro Yellow Line smoke incident. (Zambri Decl. ¶ 16). Regan Zambri Long PLLC, and specifically Salvatore J. Zambri and Christopher J. Regan, also in this Court certified a class for settlement purposes involving a national bank, and certified a class and obtained a judgment for $5,513,168.55 against the individual defendants in that same case. *McMullen v. Synchrony Bank*, No. CV 14-1983 (JEB), 2020 WL 1975425, at *1 (D.D.C. Apr. 24, 2020). (Zambri Decl. ¶ 17). In his more than thirty years of practice, Mr. Zambri has obtained multiple

seven- and eight-figure recoveries for his clients. (Zambri Decl. ¶ 16). For example, in October 2018, Mr. Zambri and Mr. Regan obtained a jury verdict in the amount of nineteen million five hundred thousand dollars ($19,500,000) in the Circuit Court for Montgomery County, Maryland, in the matter of *Mattingly, et al. v. Estate of Racca*, Case No. 438111-V. *Id*.

Finally, Plaintiffs' Counsel satisfy the final Rule 23(g)(1)(A) factor because they have committed, and will continue to commit, the resources necessary to fully protect the interests of the Class. (Zambri Decl. ¶¶ 2-13). Regan Zambri Long PLLC is a well-established law firm that has the resources, knowledge, and personnel necessary to vigorously pursue a case of this magnitude. The firm's resources are not merely financial, but also include substantial expertise and work-product in similar cases. (Zambri Decl. ¶¶ 2-22). Based on the firm's work in this matter, as well as its experience in prosecuting claims in complex litigation, Regan Zambri Long PLLC fully understands the substantial investment of time and resources necessary to properly pursue and lead this action, and it is fully committed to making the necessary investment in this case.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion in its entirety and enter the accompanying proposed order, which (1) certifies the Proposed Class; (2) requires Defendant Whole Foods to produce contact information for each putative Class Member; (3) approves the form, content, and method of distribution of Plaintiffs' proposed Notice; and (4) appoints Regan Zambri Long PLLC as Class Counsel.

Dated: March 3, 2023

Respectfully submitted,

REGAN ZAMBRI LONG PLLC

By:    /s/ *Salvatore J. Zambri*

Salvatore J. Zambri      D.C. Bar No. 439016
szambri@reganfirm.com
Patrick M. Regan       D.C. Bar No. 336107
pregan@reganfirm.com
Christopher J. Regan    D.C. Bar No. 1018148
cregan@reganfirm.com
1919 M Street, NW, Suite 350
Washington, DC 20036
PH:   (202) 463-3030
FX:   (202) 463-0667
*Co-Counsel for Plaintiff*