## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MICHAEL MOLOCK, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 16-cv-2483 (APM)** |
| ) | |
| **WHOLE FOODS MARKET, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

## I.    INTRODUCTION

Plaintiffs Michael Molock, Randal Kuczor, Jose Fuentes, Christopher Milner, and Jon Pace ("Plaintiffs") are current and former employees of Whole Foods grocery stores.  Their suit centers on Whole Foods' "Gainsharing" program, a bonus program designed to incentivize individual store departments to operate under budget by sharing labor cost savings with employees.  Plaintiffs allege that Whole Foods operated this program in a fraudulent manner and that they were unlawfully denied Gainsharing payments as a result.  On behalf of a putative class of similarly situated past and present employees, they bring this action against Defendant Whole Foods Market Group, Inc. to recover unpaid wages and other damages.[1]

Before the court is Plaintiffs' Motion for Class Certification and various motions to strike. For the reasons that follow, the motion for class certification is denied and the remaining motions are denied as moot.[2]

---

[1] Whole Foods Market, Inc. is the lead named defendant, but the court dismissed it from this action for lack of personal jurisdiction.  *See Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 127–29 (D.D.C. 2018).

[2] The court apologies to the parties for the length of time it has taken to resolve these motions.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     The Gainsharing Program

Throughout Plaintiffs' employment, Whole Foods operated a profit-sharing program, known as Gainsharing, to incentivize greater productivity and increased revenue. Pls.' Stmt. of P&A in Supp. of Pls.' Mot. for Class Action Certification, Issuance of a Class Notice, & Appointment of Counsel, ECF No. 175-2 [hereinafter Pls.' Mot.], at 8–9; Def.'s Mem. in Opp'n to Pls.' Mot., ECF No. 181 [hereinafter Def.'s Opp'n], Ex. A, Gainsharing Guide, ECF No. 181-2 [hereinafter Def.'s Ex. A], at -17 (last two digits of Bates numbering). Under this compensation scheme, Whole Foods paid bonuses to employees, known as Team Members, whose departments spent less on labor hours than budgeted. Def.'s Ex. A at -18. For example, if a team was allotted $20,000 to pay its wages but spent only $17,000, the remaining $3,000 was considered a "[l]abor [s]urplus" from which Gainsharing bonuses could be paid. *Id.*

On a monthly and annual basis, Whole Foods made payments from labor surpluses to Team Members. *Id.* Bonus payments would take two forms: direct payments and payments from the "savings pool." *Id.* Each month that a Team achieved a labor surplus, a certain percentage would be paid directly to those Team Members and the rest would be placed in that Team's "savings pool." *Id.* The percentage set aside varied based on the current amount in a Team's savings pool. *Id.* When the pool was empty, 60% would be paid directly to Team Members and 40% would be put into the savings pool until it reached $2,000. *Id.* Once the pool hit $2,000, the direct payment share increased to 80% and the savings pool set-aside was reduced to 20%. *Id.* Once the savings pool reached $4,000, 100% of subsequent labor surplus amounts would be distributed directly to eligible Team Members each of the following months until the savings pool was emptied. *Id.*

At the end of the first quarter of each fiscal year, the savings pool would be emptied and paid out. *Id.* Apparently, the savings pool also could run a deficit, although the record is unclear as to how exactly that might occur. *Id.* at -24. In that event, labor surpluses added to the savings pool would be used to reduce any deficit. *See id.* The overall monthly Gainsharing payout amount was "based on team sales, budget labor percentage, actual labor costs, and Savings Pool balance." *Id.* at -22.

Whole Foods employees that worked either on the "Front End Team" or the "Administration Team" also were eligible for Gainsharing payments, but by a different formula than their colleagues who worked in store departments. *Id.* at -18. Whether such employees achieved labor surpluses depended on store-wide performance, not that of an individual department. *Id.*

Additionally, not all employees were eligible to receive Gainsharing payments. Probationary employees, for example, did not become eligible until they received an affirmative vote from fellow Team Members to allow them to join a particular Team and participate in the program. *Id.* at -19.

2.    *Alleged Gainsharing Violations and Whole Foods' Response*

In the fall of 2016, Whole Foods received anonymous tips on its employee hotline that eventually gave rise to this case. The callers alleged that Store Team Leaders—the equivalent of a store manager—at stores in the Washington, D.C. area were improperly shifting labor hours and associated costs at the end of the month from Teams in deficit to those in surplus. Def.'s Opp'n, Ex. H, ECF No. 181-66; *id.*, Ex. I, Dep. of David Gearhart, ECF No. 181-68 [hereinafter Gearhart Dep.], at 35:19–46:2. This practice had the effect of reducing the total number of Teams that were in deficit. It also was a prohibited practice under the Gainsharing program.

A team in deficit was one that spent more on wages than budgeted.  Conversely, a team in surplus was one that spent less on wages than budgeted.  Transferring labor hours from a team in deficit to one in surplus reduced the deficit, but it also reduced the surplus.  For example, say Team A was allotted $20,000 to pay wages but only spent $15,000, resulting in a $5,000 surplus, whereas Team B was allotted $20,000 to pay wages but spent $23,000, resulting in a $3,000 deficit.  To bring Team B out of deficit, the allegation was that Store Team Leaders were shifting $3,000 worth of Team B's labor hours to Team A.  This transfer would wipe out Team B's deficit, but it also would reduce Team A's surplus from $5,000 to $2,000.  A smaller surplus meant less money for the Gainsharing bonus pool for Team A and less money in those employees' pockets.  *See, e.g.,* Def.'s Opp'n, Ex. G-4, Dep. of Katia Sadoudi, ECF No. 181-59, at 172:10-14 (testimony from Store Team Leader that she understood that "because of labor transfer" "certain teams got less Gainsharing").

Whole Foods responded to these allegations with an investigation of ten Store Team Leaders in the Mid-Atlantic region.  David Gearhart, Whole Foods' Mid-Atlantic Region Human Resources Director, spoke with employees and reviewed payroll and labor records to determine if there had been Gainsharing violations.  Gearhart Dep. at 34:13-16, 35:1-21, 41:5-16; Def.'s Opp'n, Ex. J, Dep. of Scott Allshouse, ECF No. 181-70, at 42:19–43:6, 44:3-4.  Gearhart's investigation resulted in the firing of nine Store Team Leaders, who admitted to manipulating the Gainsharing program.  Def.'s Opp'n at 5; *see, e.g.,* Def.'s Opp'n, Ex. G-1, Dep. of Victor Vasquez, ECF No. 181-56 [hereinafter Vasquez Dep.], at 43:2-44:21.[3]

---

[3] Litigation ensued from these firings.  The nine Store Team Leaders sued Whole Foods for terminating them in retaliation for whistleblowing on the Gainsharing violations.  *See Vasquez v. Whole Foods Market, Inc.*, No. 17-cv-112 (APM).  The court consolidated the *Vasquez* matter and this case for purposes of discovery.  The *Vasquez* case is no longer active, as the parties reached a settlement.

Meanwhile, Whole Foods expanded the investigation nationwide to identify further possible Gainsharing violations. *See* Pls.' Mot., Ex. D, Dep. of James Michael Grady, ECF No. 176-86 [hereinafter Grady Dep.], at 158:3-6, 160:5-11. Led by employee Michael Grady, this inquiry consisted of a review of raw timekeeping data to determine whether (1) a Team Member's time was moved to another team in the same store, (2) the Team Member's "home team" "barely made/[had] not made labor," and (3) the movement of labor followed any discernable patterns. Def.'s Opp'n, Ex. N, ECF No. 181-77, at 211615. For example, transfers of labor hours that consistently resulted in different Teams moving in or out of surplus or deficit might provide a basis to suspect labor was being improperly transferred. Based on these factors, Grady identified 119 stores for further investigation, and as to each of those stores expressed either a 60% or 90% "confidence level" that "an investigation should be triggered." *Id.* at 211614–15, 211618. Golda Sahayam, the senior coordinator for Whole Foods' Enterprise Business Systems, who supported Grady's investigation, wrote in an email on November 23, 2016, that those 119 stores "almost certainly moved labor across product teams to increase gainsharing." Pls.' Mot., Ex. 9, ECF No. 175-15 [hereinafter Pls.' Ex. 9]; Def.'s Opp'n, Ex. Y, Decl. of Golda Sahayam in Supp. of Defs.' Mot. for Summ. J., ECF No. 181-97 [hereinafter Sahayam Decl.], ¶ 3.

### 3. *Whole Foods Hires Deloitte*

After Whole Foods completed its initial investigation in November 2016, it retained Deloitte Financial Advisory Services, LLP ("Deloitte") to determine whether Gainsharing violations had adversely affected Team Members' bonus payments during fiscal years 2014, 2015, and 2016. Def.'s Opp'n, Ex. T, ECF No. 182-33 [hereinafter Def.'s Ex. T], at 731858; Def.'s Opp'n, Ex. Q, Dep. of Anthony Campanelli (June 21, 2021), ECF No. 181-89 [hereinafter Campanelli Dep. I], at 12:4-19. The Deloitte team was led by Anthony Campanelli.

Before turning to Deloitte's work and findings, it is important to explain why labor might *legitimately* shift between Teams and how such a shift is recorded.  The quintessential example of a proper labor shift is that of a Team Member calling in sick.  An employee from a different Team might have to cover for their ill colleague, resulting in a transfer of labor from one Team to another.  Another example is that, during the holidays, certain Teams require more labor.  This might necessitate moving employees from their usual Team to a different one.  A store promotion might have the same effect.  These are all valid reasons for transferring labor between Teams.

In terms of how a shift in labor is recorded, Whole Foods maintains what is known as the Kronos system, which is an electronic payroll database that tracks, among other things, labor transfers within stores.  Labor can be transferred either manually or non-manually.  A manual transfer is, in a sense, a post-hoc action.  Employees are not always notified in advance of an assignment to a different department, *e.g.*, when an employee unexpectedly calls in sick from one Team, requiring coverage from a different Team.  When that occurs, the labor transfer must be physically inputted into the Kronos system.  Manual transfers are supposed to be documented with what is called a Time Transfer Form ("TTF").  A properly completed TTF should contain, among other things, the name of the transferred Team Member, the date and length of time of the transfer, and the reason for the transfer.  Def.'s Opp'n, Ex. II, ECF No. 182-17 [hereinafter Def.'s Ex. II], at 732259–61 (examples of TTFs).  A non-manual transfer, by comparison, is automated.  It occurs when a manager inputs the reassignment to a different Team into Kronos and the employee receives advance notice of the change.  A non-manual transfer does not require filling out a TTF.

Now back to Deloitte.  Whole Foods had made a "business decision" to compensate store employees at nine Mid-Atlantic stores potentially impacted by possible Gainsharing violations.  Def.'s Opp'n, Ex. L, Dep. of Scott Allshouse, ECF No. 181-73, at 84:7-15; 88:3-15.  Store Team

Leaders at those locations had admitted to carrying out improper labor shifting.  Defs.' Opp'n at 5 n.4 (citing testimony from nine Store Team Leaders).  Whole Foods had decided that based "solely [on] the absence of a[n adequately] document[ed]" transfer, it would attempt to make affected Team Members whole, "regardless of whether that transfer was proper or improper, regardless of whether that caused the home department to flip from deficit to surplus, regardless of whether [] the individual department should have received . . . a surplus based upon the labor pool."  Defs.' Opp'n, Ex. R, Dep. of Anthony Campanelli (May 11, 2022), ECF No. 181-90 [hereinafter Campanelli Dep. II], at 344:14–345:1.

Campanelli's team proceeded in two phases.[4]  First, it identified and inspected 7,336 manual transfers at the nine Mid-Atlantic stores.  Def.'s Opp'n, Ex. LL, ECF No. 182-20, at 732008.  The process included collecting TTFs, manual punch sheets, emails, and timesheet schedules, as well as interviewing the Payroll Benefits Specialist at each store to understand "the specific manual transfer process."  Def.'s Ex. T at 731860–61.  Deloitte then "reviewed supporting documentation to assess the degree to which each transfer appeared reasonable, considering factors such as the extent to which documentation was available . . . [and] the potential sufficiency of the reason/description contained on the supporting documentation."  *Id.* at 731862.  Finally, Deloitte categorized all manual transfers as "supportable" or "unsupportable."  An "unsupportable" transfer either had no supporting documentation or it was not sufficiently detailed to understand the transfer.  *Id.*  A "supportable" transfer was one for which supporting documentation was available

---

[4] As detailed in an earlier opinion, Whole Foods first hired Campanelli as a consulting expert to support its internal investigation and defending various suits.  *See Vasquez v. Whole Foods Mkt.*, Inc., No. 16-cv-2483 (APM), 2021 WL 11432979, at *4 (D.D.C. Nov. 29, 2021).  Later, Whole Foods designated Campanelli "as a knowledgeable witness" and "potential hybrid and fact witness."  *Id.* (citation omitted).  When the *Vasquez* plaintiffs challenged this dual-hatted role, the court held that Whole Foods had waived privileges with respect to Campanelli and ordered it to disclose all work that Deloitte had performed relating to his labor-shifting analysis (described below).  *See id.* at *5–7.

and such documentation provided sufficient information (e.g., date, number of hours, rationale) to understand the transfer.  *Id.*

Deloitte's analysis of transfers did not stop with the document review.  It performed "additional testing procedures on those transfers initially classified as Supportable."  Def.'s Ex. T at 731862; *see also* Campanelli Dep. I 49:2–51:8 (describing examples of labor transfers arising out of a "Wine In the Woods" event and an injury to a meat department employee as involving in-depth review).  "[A]dditional testing" focused on certain types of employees, such as dishwashers or Store Team Leaders, or particular tasks routinely subject to labor transfer, such as assisting with inventory shipments during the holidays or staffing the store's Holiday Table, which involved demonstrations of holiday-themed products.  Def.'s Ex. T at 731862–64.  After performing this analysis, Deloitte "arrived at a final population of manual labor hour transfers which were assessed to be Supportable and Unsupportable" for the Mid-Atlantic stores.  *Id.* at 731864.

Having divided transfers into these two categories, Deloitte then performed a "repayment analysis."  Def.'s Ex. T at 731864.  That analysis involved identifying the Teams that "may have been adversely affected by incoming transfers of labor hours which were assessed to be Unsupportable," *id.*; determining the impact of those transfers on that Team's surplus, *id.* at 731865–66; and then "endeavor[ing] to calculate the [Gainsharing] surplus that each team member would have received had it not been for the transfer of unsupportable labor hours."  *Id.* at 731867; *see also* Pls.' Mot., Ex. P-1, Dep. of Anthony Campanelli (June 21, 2021), ECF No. 179-68 [hereinafter Campanelli Dep. III], at 203:12–204:10, 209:6–210:10.  Campanelli succinctly summarized the "repayment analysis" as follows: "Deloitte was trying to calculate payments to team members that may have been impacted by unsupported manual labor transfer hours.  And to the extent that there were transfers with no documents or unsupportable documents, they formed

. . . part of a pool that formed part of the payment analysis that took over 2500 or so individual worksheets to prepare to make a payment to team members." *Id.* 207:1-9.

According to Campanelli, in undertaking this exercise, Deloitte was not trying to determine whether a transfer violated the Gainsharing program.  In other words, it was not "looking to see whether a transfer was justified or not justified, valid or invalid, proper or improper, appropriate or inappropriate."  Campanelli Dep. I at 43:2-4.  Instead, Whole Foods had "made a business decision that to the extent the transfers were unsupportable, . . . [Whole Foods was] going to make a payment to team members that may have been impacted."  *Id.* at 21:3-8.  Deloitte was not attempting to determine "what people were owed," because that inquiry would have required an assessment of "whether the transfers were proper, improper, valid, invalid."  Campanelli Dep. II at 102:19–103:1.  Whole Foods made a "conservative effort to err on the side of payment based upon their business decision."  *Id.* at 344:13–345:4

Whole Foods then asked Deloitte to expand its work, ostensibly as litigation consultants, *see supra* n.4, to conduct a "risk assessment" of an additional 113 stores[5] to determine whether they presented issues like the nine Mid-Atlantic stores.  Pls.' Mot., Ex. P-2, Dep. of Anthony Campanelli (May 11, 2022), ECF No. 179-69 [hereinafter Campanelli Dep. IV], at 37:5-11, 54:9-22; Campanelli Dep. II at 102:2-11, 103:20-104:1.  (The Store Team Leaders at these other stores had not acknowledged any improper labor shifting.  Campanelli Dep. II at 102:2-8.)  Whole Foods did not ask Deloitte to perform a "repayment analysis" for the 113 stores, meaning it was not trying to determine whether employees were owed money as a result of improper labor shifting.  Campanelli Dep. II, at 102:19–103:15.  Rather, Deloitte limited its work to a "four-corner review," meaning it attempted only to match manual transfer entries in Kronos to some form of

---

[5] These 113 stores were among the 119 stores that Grady investigated.  *See* Section II.A.2 *supra*.  The court had ordered discovery as to these 113 stores in the related *Vasquez* case.

documentation.  It did not, as it had done with the Mid-Atlantic stores, perform any additional testing.

Deloitte analyzed Kronos data for the 113 stores and reviewed hundreds of thousands of pages relating to over 19,000 transfers.  Campanelli Dep. II at 143:4-7; Def.'s Ex. II at 732257. It categorized each transfer as either "supportable," "unsupportable," or "no documents."  Def.'s Ex. II at 732257.  A "supportable" transfer was one for which documentation sufficiently described the nature of the transfer; an "unsupportable" transfer was one for which there was no description or an insufficient one to understand the nature of the transfer; and "no documents" simply meant no documentation was identified relating to the transfer in Kronos.  *Id.*  For the 113 stores, Deloitte deemed only 3.4% of the transfers as "supportable," 19.2% as "unsupportable," and found that 77.4% had "no documents."  *Id.*

## B.    Procedural Background

Plaintiffs filed this putative class action on December 20, 2016.  Compl., ECF No. 1. Whole Foods at the outset moved to dismiss Plaintiffs' Second Amended Complaint, which the court denied in part and granted in part.  *See Molock v. Whole Foods Market Group, Inc.*, 297 F. Supp. 3d 114 (D.D.C. 2018).  As part of its decision, the court rejected Whole Foods' request to dismiss putative class members outside the District of Columbia, *see id.* at 126–27, but certified the question for interlocutory review, *see Molock v. Whole Foods Market Group, Inc.*, 317 F. Supp. 3d 1 (D.D.C. 2018), which the D.C. Circuit accepted, *see Molock v. Whole Foods Market Group, Inc.*, 952 F.3d 293 (D.C. Cir. 2020).  The interlocutory appeal narrowed the scope of initial class discovery.  During the pendency of the appeal, the court permitted discovery to proceed only as to "all Whole Foods grocery stores operated by Defendant Whole Foods Market Group in the District of Columbia, Maryland, and any other store at which a plaintiff in the

[*Vasquez* case] was employed." Order, ECF No. 45.  The scope of class discovery expanded after remand from the D.C. Circuit, which held that Whole Foods' motion to dismiss putative class members was premature because no class had yet been certified.  *Molock*, 952 F.3d at 298.

Plaintiffs now move for class certification on the following claims: (1) breach of contract and breach of the duty of good faith and fair dealing (Count I); (2) unjust enrichment (Count II); (3) failure to pay wages upon discharge in violation of D.C. Code § 32–1303 (Count III); (4) failure to pay wages in violation of D.C. Code § 32–1302 (Count IV); (5) failure to maintain accurate employment records in violation of D.C. Code § 32–1008 (Count V); (6) failure to pay wages upon discharge in violation of Maryland Code § 3–504 (Count VI); (7) failure to pay wages in violation of Maryland Code § 3–502 (Count VII); (8) failure to inform of wages in violation of Maryland Code § 3–504 (Count VIII); and (9) fraud (Count XI).  Pls.' Mot. at 29.

In their opening brief, Plaintiffs proposed a class consisting of "past and present Whole Foods employees who were not paid wages owed to them under the Gainsharing program." Pls.' Mot. at 29.  Plaintiffs also proposed the following sub-classes to align with their state-law statutory causes of action and their common law fraud claim:

(a) Past and present employees of Whole Foods who were employed in the District of Columbia and did not receive all earned wages at least twice during each calendar month on regular paydays in violation of the District of Columbia Wage Payment and Collection Law.

(b) Past employees of Whole Foods who were employed in the District of Columbia and were not paid all earned wages within seven days after resignation or termination.

(c) Past and present employees of Whole Foods who were employed in the State of Maryland and did not receive all earned wages at least once in every two weeks or twice in each month on regular paydays, in violation of MD Code, Labor and Employment, § 3–502.

(d) Past employees of Whole Foods who were employed in the State of Maryland and were not paid all earned wages for work that the employee performed

before the termination of employment, on or before the employee's next anticipated payday, in violation of MD Code, Labor and Employment, § 3–505.

(e) Past and present employees of Whole Foods who were employed in the State of Maryland and were not at the time of their hiring provided full and accurate notice of their rates of pay, in violation of MD Code, Labor and Employment, § 3–504; and,

(f) Past and present employees of Whole Foods who accepted employment from Whole Foods in reliance on the promised compensation (including Gainsharing payments) but did not receive the promised payments.

*Id.* at 30.

In their reply brief, Plaintiffs clarified that their proposed class definitions were limited by both geography and time. The sole remaining defendant—Whole Foods Market Group, Inc.— owns stores only in "the Midwest, Northeast, North Atlantic, Mid-Atlantic, South, and Florida regions." Pls.' Reply in Supp. of Pls.' Mot., ECF No. 193 [hereinafter Pls.' Reply], at 2. "The proposed class," Plaintiffs acknowledged, "is necessarily limited to the stores contained in those regions." *Id.* The total number of stores covered by the proposed class was 68, spread across 21 states and the District of Columbia. *Id.* at 3. Plaintiffs further narrowed the class to include only those who worked at the relevant stores from October 31, 2013, through December 31, 2016, to coincide with the period of Deloitte's initial review of the Mid-Atlantic stores. *Id.* Plaintiffs noted that they had narrowed the temporal scope of the class purely for "manageability of the case," and that they would consider asking to expand the class after merits discovery. *Id.*

Whole Foods urges the court to reject class certification for a host of reasons. *See generally* Def.'s Opp'n. It also moves to strike certain evidence relied on by Plaintiffs: (1) Deloitte's analysis as to the 113 stores based on work product privilege (notwithstanding the court having previously ruled the privilege to have been waived, *see supra* n.4) and (2) a declaration submitted by counsel as improper expert testimony. Def.'s Mot. to Strike Deloitte's Add'l Analysis from Pls.' Mot.,

12

ECF No. 183; Def.'s Mot. to Strike, or Alternatively to Compel Discovery Relating to Certain Portions of Plaintiffs' Counsel's Decl. & Pls.' Mot, ECF No. 184.  Whole Foods also moves to strike certain arguments about the various state laws applicable to Plaintiffs' common law claims raised for the first time in their reply brief.  Def.'s Mot. to Strike, ECF No. 195.  Last, it seeks dismissal of the class claims of out-of-state class members for lack of personal jurisdiction, if the court were to certify the class.  Def.'s Mot. to Strike Nonresident Class Members for Lack of Personal Jurisdiction, ECF No. 185.

The court heard argument on these motions on September 20, 2024.

## III.    LEGAL STANDARD

Rule 23 of the Federal Rules of Civil Procedure permits certification of a class of plaintiffs only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and,

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

If these prerequisites are met, the proposed class also must satisfy Rule 23(b). Here, Plaintiffs move for certification under Rule 23(b)(3).  That rule permits certification if "questions of law or fact common to class members predominate over any questions affecting only individual members, and [if] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  A court evaluating a proposed class under subsection (b)(3) must consider four factors:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

*Id.*

Rule 23 does not set forth "a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, the party seeking class certification must satisfy Rule 23's requirements by a preponderance of the evidence. *Parker v. Bank of Am., N.A.*, 99 F. Supp. 3d 69, 80–81 (D.D.C. 2015) (collecting cases). The inquiry requires the court to undertake a "rigorous analysis." *Id.* at 351 (internal citation and quotation marks omitted). At the certification stage, an inquiry into the merits of the claims may be considered "to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 466 (2013) (citations omitted).

## IV.    DISCUSSION

The court begins and ends its Rule 23 analysis with the commonality and predominance inquiries, as Plaintiffs can satisfy neither. "Due to the similarities between the two requirements, in class actions that are sought to be maintained under Rule 23(b)(3), courts will often treat the application of Rules 23(a)(2) and 23(b)(3) together[.]" 1 *Newberg & Rubenstein on Class Actions* § 3:27 (6th ed. 2024).

Commonality requires that the plaintiffs' claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its

truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Thus, what "matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (citation omitted) (emphasis in original). "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* (citation omitted).

"Even if Rule 23(a)'s commonality requirement may be satisfied by [a] shared experience, the predominance criterion is far more demanding." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997). That criterion "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *id.* at 623, and it turns on "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues," *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). Plaintiffs must also "show that they can prove, through common evidence, that all class members were in fact injured[.]" *In re Rail Freight Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 252 (D.C. Cir. 2013) (*Rail Freight I*).

### A.    Statutory Wage Claims Under District of Columbia and Maryland Law

At the heart of Plaintiffs' proposed class and wage subclasses is what they call a "nationwide pickpocketing practice." Pls.' Mot. at 2; *see supra* at 11 (designated subclasses (a)–(d)). Their contention is that Whole Foods' store managers across the country routinely transferred labor costs from store Teams operating in labor-cost deficits to Teams with labor-cost surpluses, which was disallowed under the Gainsharing program. The effect of such transfers was to shrink deficits of Teams that had overspent on labor. But by shrinking deficits, managers also reduced

surpluses for the Teams that had underspent on labor. And by reducing surpluses, Plaintiffs say, Whole Foods paid out less in Gainsharing payments to Team Members who earned such wages.

According to Plaintiffs, "[t]he common issue for each of the putative Class members is whether there were unsupported labor transfers in their respective stores." Pls.' Mot. at 33; Hr'g Tr., Sept. 20, 2024, ECF No. 202 [hereinafter Hr'g Tr.], at 10:12-13 ("The common question is: Are there unsupported transfers?"). That theory of commonality (and predominance) goes something like this. Whole Foods employees punched in and out at the beginning and end of a shift; those hours were automatically recorded in the Kronos timekeeping system and reported as labor tied to their assigned, or "home," team. Def.'s Opp'n, Ex. E-10, Decl. of Kevin Kitching, ECF No. 181-20, ¶ 9 [hereinafter Kitching Decl.]. In a typical labor transfer, when employees were reassigned to other Teams in advance, the transfer of hours occurred automatically. *Id.* ¶ 10. But sometimes a department required last-minute staffing changes. *Id.* In those instances, the Payroll Benefits Specialist in each store accessed Kronos to manually adjust the labor hours after the fact to accurately reflect that shift, *i.e.*, a manual transfer. *Id.* ¶ 11. A manual transfer is supposed to be accompanied by a TTF or some other documentation that explains the reason for the transfer. Kitching Decl. ¶ 11. According to Plaintiffs, it is the absence of a TTF or other documentation—a so-called "unsupportable" transfer—that proves a Gainsharing violation and establishes a denial of wages. As proof, Plaintiffs rely primarily on Whole Foods' own investigations and the work done by Deloitte. They cite to Grady's initial analysis identifying 119 stores as warranting more investigation and Sahayam's emails characterizing their findings. Pls.' Mot. at 33–34. They also rely on Deloitte's work analyzing 113 of those 119 stores, which concluded that only 4% of thousands of labor transfers were "supported." *Id.* at 34; Pls.' Reply at 8–9 n.11, 16–17, 25–26.

There are two main problems with Plaintiffs' reliance on "unsupportable" transfers to satisfy the elements of commonality and predominance. First, the fact of an "unsupportable" transfer does not answer whether that individual transfer of labor hours violated the Gainsharing program *and* resulted in an unpaid bonus. Second, Plaintiffs' reliance on "unsupportable" transfers does not provide a mechanism for sorting injured from uninjured putative class members.

    *1.    "Unsupportable" Transfers*

    a.    <u>An "unsupportable" transfer is not necessarily an improper transfer.</u>

Plaintiffs equate an "unsupported" transfer with a Gainsharing violation and a Gainsharing violation with unpaid wages. Hr'g Tr. at 29:6-9 (Plaintiffs' counsel agreeing that Plaintiffs' theory is "no TTF equals bad transfer equals wage theft"). That is not, however, a "common contention . . . of such a nature that it is capable of classwide resolution." *Wal-Mart*, 564 U.S. at 350. Put differently, the absence or presence of "unsupportable" transfers cannot "be used to prove an element of the cause of action for each member." *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 22 (D.D.C. 2012).

The reason is this: An "unsupportable" transfer does not, without (much) more, establish a violation of the Gainsharing program. It is not Plaintiffs' contention that the shifting of labor hours was inherently improper. Hr'g Tr. at 21:12-14 (conceding that that there could be valid reasons for transfers). Nor do they assert that every transfer from a deficit team to a surplus team violated the Gainsharing program. *Id.* at 21:15-18. Only if a transfer was done for the purpose of reversing or shrinking a deficit do Plaintiffs contend it was impermissible. *See* Pls.' Mot. at 9 (asserting that Store Team Leaders "were instructed by their executive coordinators at the corporate office to 'transfer' or 'shift' labor from teams in deficit to teams in surplus irrespective of whether the team member actually worked in the department"); Hr'g Tr. at 27:22–28:7. But the only way to know

whether a transfer was valid or not is to identify the *reason* for it.  That "why" question can only be answered with individualized proof.  Merely identifying an "unsupportable" transfer is not enough.

The concept of an "unsupportable" transfer is not one of Plaintiffs' making; it was developed by Deloitte.  Recall, Deloitte did not equate an "unsupportable" transfer with an illegitimate one.  Rather, it deemed a transfer "unsupportable" when the documentation was not sufficient to reasonably establish its purpose.  Def.'s Ex. T at 731862; Def.'s Ex. II at 732257.  Either there was no documentation, or the documentation that existed was inconclusive.[6]  But Deloitte recognized that it could not make a validity determination based simply on the absence of adequate documentation.  After all, a neglectful failure, or even an intentional one, to complete a TTF does not mean that the transfer was for an improper reason.  Ascertaining the true purpose likely would require a store-level investigation of the circumstances of the transfer, which in some cases might mean interviewing the employee who authorized the transfer or whose actual labor was shifted.  *See, e.g.*, Campanelli Dep. I at 39:4-5 ("Each individual transfer . . . is very unique and individualized to [a] team member . . . ."), *id.* at 40:4–41:14 (describing the transfer of labor for a "Wine in the Woods" event in Columbia, Maryland, as having required an individualized investigation to determine the purpose of the transfer).  Whole Foods did not ask Deloitte to make such fine-grained assessments of every transfer.  *See, e.g.*, *id.* at 43:1-4 ("I wasn't looking to see whether or not [a transfer] was justified or not justified, valid or invalid, proper or improper, appropriate or inappropriate."); 65:22–66:3 ("Deloitte wasn't engaged to assess whether a TTF was proper or not proper or whether the form itself was properly filled out or not properly filled out.").

---

[6] In its evaluation of the 113 stores, Deloitte also created a "no documents" category.  For present purposes, the court will treat those also as "unsupportable" transfers.

Thus, the mere fact that Deloitte classified a transfer as "unsupportable" does not mean that the transfer was improper.  Individualized proof still would be required to make that determination.  Plaintiffs' proposed class therefore cannot satisfy the commonality and predominance requirements.  *See Hoggard v. Nationstar Mortgage LLC*, 17-cv-99, 2021 WL 7162301, at *10 (D.D.C. 2021) (rejecting class certification where "an individualized and holistic analysis of a borrower's loan file is necessary to determine whether the home borrower occupied [the property] when [the defendant] began assessing the disputed costs to that borrower's loan balance").

b.    <u>An "unsupported" transfer does not necessarily signify wage loss.</u>

The need for individualized evidence does not end with a determination of a transfer's purpose.  Even if Plaintiffs were to establish that an "unsupported" transfer was for a prohibited purpose, context-specific proof would be required to determine whether a putative class member suffered a resulting wage loss.  To determine whether an injury occurred demands individualized answers to at least the following questions: (1) what was the impact of the transfer on any given team's surplus or deficit?; (2) what was the level of the team's savings pool?; and (3) if the store participated in storewide Gainsharing,[7] what percentage of the Team's surplus was shared and how did the transfer affect that source of potential bonus money?  Def.'s Opp'n at 12.

The unrebutted report of Whole Foods' expert, James Langenfeld, highlights the importance of these fact-specific inquiries.[8]  As Langenfeld observes, "a transfer that caused a home team to go from a deficit to a surplus position would result in a Gainsharing payment to the

---

[7] Whole Foods allowed store employees to vote on whether to participate in storewide Gainsharing.  Def.'s Ex. A at -23.  Under that program, Teams in surplus could pool their surpluses to contribute to storewide bonuses to Team Members on Teams with a labor surplus.  *Id.*  This practice encouraged employees to tie their Teams' success to the overall success of the store.  Stores could elect the percentage of a Team's surplus—10%, 20%, or 30%—that would go towards storewide Gainsharing.  *Id.*  So, if a store participated in storewide Gainsharing, a Team Member could receive both team and storewide bonuses.  *Id.*

[8] Plaintiffs sponsored no expert of their own to rebut Langenfeld's opinions.

home team." Def.'s Opp'n, Ex. D-3, Expert Report of James Langenfeld, Ph.D., ECF No. 200-2, ¶ 118 [hereinafter Langenfeld Report]. That result might not obtain, however, if the home team's savings pool was negative, in which case surpluses would draw down the deficit and not result in bonuses. Def.'s Ex. A at -24 (describing the "deep deficit" program). And the problem becomes even more complex when the impact of storewide Gainsharing, *see supra* n.7, is taken into account. Langefeld Report ¶¶ 119–20. Ultimately, as Langenfeld observes, "one may have to net out the gains from the losses to determine if a Team Member was on balance harmed by the transfers." *Id.* ¶ 119. That reality poses a problem for class certification. *See Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 24 (D.D.C. 2012) (explaining that the plaintiffs' proposed standard for assessing injury "fail[ed] to take into account any *benefits* [putative class members] may have received" from the defendant's alleged illegal conduct) (emphasis in original).

Another wrinkle of the Gainsharing program adds even more complexity. Administrative Team employees are included in Plaintiffs' proposed classes, and they were paid Gainsharing bonuses based on the average performance of other Teams. Def.'s Ex. A at -18; Def.'s Opp'n, Ex. D, Decl. of James Langenfeld, ECF No. 181-8 [hereinafter Langenfeld Decl.], ¶ 20. Langenfeld determined that transferring hours from a team in deficit to the Administrative Team had no negative effect on members of other Teams. *See id.*; Langenfeld Report ¶¶ 39, 121. If anything, such a transfer would benefit the team whose hours were transferred by reducing their deficit *and* perhaps even benefit Administrative Team Members because their Gainsharing increased when fewer store Teams were in deficit. Langenfeld Decl. ¶ 20. So, even an improper labor transfer to the Administrative Team would not have reduced any Team Member's pay.

A data analysis done by Langenfeld further underscores the individualized nature of the inquiry at hand. Langenfeld studied the unsupportable transfers during a four-month fiscal period

and was asked to determine whether such transfers might have harmed Team Members. *Id.* ¶¶ 18-24, Ex. D-2. By way of example, in the Coral Springs store, Langenfeld identified nine unsupportable transfers. In eight out of those nine, the labor was shifted to the Administrative Team, so the shift resulted in no lost wages. The only other unsupportable transfer was to a department that Langefeld determined would not have reduced Gainsharing payments. *Id.*, Ex. D-2. So, none of the nine studied transfers resulted in a wage loss.

Across all stores, Langenfeld determined that, in the worst-case scenario for Whole Foods, 72% of unsupportable transfers in one store (Fairfield – Northeast region) *potentially* could have caused wage losses. *Id.* ¶ 25. Worst-case scenario stores in five other regions ranged from 40% to 68% of transfers that potentially could have caused harm. *Id.* Langenfeld concluded that "a significant portion of unsupportable labor hour transfers, which are relied upon by Plaintiffs in support of class certification, could not cause harm to the departments to which they were transferred." *Id.* He also opined that "one would have to perform an individual analysis for each of the departments within each of the [Whole Food Market Group] stores to determine whether a Team Member had been adversely affected, even assuming that all undocumented transfers were improper." *Id.* ¶ 25. Plaintiffs have offered no rebuttal to these opinions.

*        *        *

In sum, Plaintiffs' proffered "common issue" of "whether there were unsupported transfers in their respective stores," Pls.' Mot. at 33, cannot resolve the question of liability on a class-wide basis. An unsupportable transfer does not necessarily equate to an improper transfer. Only an individualized determination of the transfer's purpose can answer that question. Further, even if an unsupportable transfer was improper, there are simply too many variables at play to determine

whether such a transfer in fact caused a loss of wages. These realities are fatal to establishing the elements of commonality and predominance.

2. *Uninjured Class Members*

Plaintiffs' proposed wage subclasses suffer from another problem. To establish predominance, Plaintiffs "must also show that they can prove, through common evidence, that all class members were in fact injured by" the defendant's conduct. *Rail Freight I*, 725 F.3d at 252 ("[W]e do expect the common evidence to show all class members suffered *some* injury.") (emphasis in original). Plaintiffs cannot satisfy this requirement.

They argue that, at the outset, class members simply can be determined based on whether an employee "worked in the stores where these [labor] manipulations took place." Hr'g Tr. at 9:24-25. Plaintiffs acknowledge that, under this approach, uninjured employees would be in the class from the outset. *Id*. at 9:5-18 (Q: "[W]hat's the common evidence that would help me define who these [employees] are . . . if it's not everyone?" A: "No, it's not everyone."). But, they say, an overinclusive class is not fatal. So long as there exists a "'winnowing mechanism' that during the liability or damages stage of trial will cull from any award those who were swept up in the Class definition but turn out to have suffered no injury," the class can be certified. Pls.' Reply at 33.

Courts have recognized that the inclusion of some uninjured class members is permissible if a plaintiff offers a mechanism to manageably root out those who are not harmed at a later stage.[9] *See In re Rail Freight Surcharge Antitrust Litig.-MDL No. 1869*, 934 F.3d 619, 625 (D.C. Cir. 2019) *(Rail Freight III)* (citing *In re Nexium Antitrust Litig.*, 777 F.3d 9, 20–21 (1st Cir. 2015)

---

[9] The question of whether courts may certify a class action where some members of the proposed class lack an Article III injury is currently before the Supreme Court. *See Laboratory Corporation of America Holdings, dba Labcorp v. Luke Davis, et al.*, Case No. 22-55873.

(holding that uninjured class members could be winnowed by having consumers file minimal, likely unrebutted affidavit testimony indicating whether they would have purchased the branded drug or a generic alternative)). In *Rail Freight III*, the lack of a winnowing mechanism was fatal to the class when 2,037 shippers, or 12.7% of the class, were admittedly uninjured. *Id.* at 625. Citing the trial court's determination that culling the class further would require "full-blown, individual trials," the D.C. Circuit held that the denial of class certification was appropriate. *Id.*

Plaintiffs suggest that uninjured class members could be winnowed away by the time of final judgment simply by "ordering Whole Foods to effectively re-run its payroll" and "any class member found to be owed $0 would receive no award." Pls.' Reply at 34. By this they seem to mean that Plaintiffs could do the same "repayment analysis" Campanelli did with the nine Mid-Atlantic stores, and that process could determine which store employees "would receive no award." Hr'g. Tr. at 14:13–15:13. But there is an obvious problem with Plaintiffs' suggestion: Campanelli's efforts were highly individualized, and whether a store employee was entitled to payment depended on a host of factors. *See* pgs. 8–9, *supra*. Determining what payroll entries to change would itself require wading into the morass of individualized facts that would destroy the predominance requirement. *See Rail Freight III*, 934 F.3d at 624 (noting that the "need for individualized proof of injury and causation [could] destroy predominance").

Finally, Plaintiffs cite *Tyson Foods* for the proposition that the court could award aggregate damages, Pls.' Reply at 24–25 (citing 577 U.S. at 458, 461), or bifurcate liability and damages, *id.* at 34 (citing 577 U.S. at 461–62); Hr'g Tr. at 16:5-6. But this case bears no resemblance to *Tyson Foods*. There, all employees in the class engaged in the same unpaid activity of donning and doffing protective gear, and the common question was whether that activity was compensable for employees that worked more than 40 hours a week. 577 U.S. at 449–50, 454. Here, there is a

myriad of factual scenarios to consider in deciding whether any given employee was not paid wages due. That complexity alone distinguishes this case from *Tyson Foods*.

### 3.  Plaintiffs' Remaining "Common" Evidence

In addition to unsupportable transfers, Plaintiffs identify various other pieces of evidence that they say is "common" to resolving the question of liability for their wage-law claims. But even accounting for this proof, Plaintiffs still cannot satisfy the elements of commonality and predominance.

First, Plaintiffs rely on Grady's investigation and Sahayam's November 23, 2016 email, which flagged 119 stores for further review for Gainsharing violations. Pls.' Reply at 16; Pls.' Ex. 9, at 2–3, 10 (ECF pagination). In identifying these stores, Grady looked at whether (1) an employee's time was moved to another team in their store; (2) the "[h]ome team barely made" or did not make their labor budget; and (3) the movement of labor followed specific patterns. Pls.' Ex. 9 at 6 (ECF pagination). Grady was 90% confident that an investigation should be triggered if a store met all three criteria, and 60% confident if a store met the first two. *Id.* Plaintiffs contend that because these confidence intervals exceeded 50%, they satisfy Rule 23's preponderance standard. Pls.' Reply at 25. But Grady's relative confidence level as to whether a store warranted *further investigation* is weak proof of an actual wage-law violation, let alone sufficient to establish whether a particular employee was improperly denied wages. Grady never took on such an ambitious endeavor.

Sahayam's email is similarly weak proof of liability. She attested that her confidence intervals and color-coding system were intended to determine which stores should be further investigated, not which stores were improperly shifting labor. Sahayam Decl. ¶¶ 9–10. Sahayam explained that the only way to know whether those transfers were in fact improper would have

been "to ask the individuals at those stores about the reasons for those transfers." *Id.* ¶ 10. Importantly, five days later, Sahayam shared an update in an email after the flagged regions had conducted more in-depth investigation in their stores and explained that "the issue seem[ed] to be isolated to the 9 stores in the [Mid-Atlantic]" region.   Def.'s Opp'n, Ex. P, ECF No. 181-88. Again, like with Grady, Sahayam's early assessment of *potential* wrongdoing is a poor marker for establishing a wage-law violation.

Next, Plaintiffs point to statements made by Whole Foods' counsel in this litigation as common proof of liability.  Pls.' Reply at 16.  Specifically, they quote the following representation made at a discovery hearing:

> To find out why Ms. Jones was transferred, you actually need to go and look at the TTF, the time transfer forms . . . . And if you want to find out, was Ms. Jones improperly transferred to bakery . . . , you actually have to look and see whether the time transfer form was manipulated in any way, was not signed, was altered.

Status Conf. Tr., 10/1/2018, ECF No. 56, at 26:24–27:5.   They also cite to Whole Foods' counterclaim in the *Vasquez* case, which made allegations about the importance of "accurate" TTFs.  Pls.' Mot. at 12 (alleging that Whole Foods claims that information in TTFs "had to be accurate").  These statements, Plaintiffs contend, are admissions that a *missing* TTF is itself proof of an improper transfer.  Pls.' Mot. at 13.  The court is unpersuaded.  There is a difference between the imperative that a TTF must be accurate versus drawing an adverse inference from its absence. At no time has Whole Foods ever said that the mere absence of a TTF means that the associated manual transfer of labor was done for an impermissible purpose.

Plaintiffs also rely on deposition testimony from Whole Foods employees Scott Allshouse and Kristin May.  Allshouse, the highest-ranking corporate official in the Mid-Atlantic region, testified that the assignment of two Team Leaders to one Team was a "red flag" indicating that it

was more likely than not that a manipulation of the Gainsharing had occurred. Pls.' Mot., Ex. B, Dep. of Scott Allshouse, ECF No. 179-57, at 228:4–10, 229:6-13. Kristen May, the Vice President of Operational Finance for the Mid-Atlantic Region, similarly testified that the presence of two Team Leaders was a "red flag" for a possible Gainsharing violation. Pls.' Mot., ECF No. 179-61, Ex. E, Dep. of Kristen May, at 96:9-11, 192:3-7. Plaintiffs also offer testimony from the *Vasquez* Plaintiffs, who testified that they often transferred Team Leaders' hours to other Teams to shrink deficits, because Team Leaders had the highest hourly wages. Pls.' Reply at 2, 16.

But this "red flag" evidence does not hold up to scrutiny as a proxy for impropriety. Whole Foods' expert, Langenfeld, identified in Gainsharing reports instances where two or more Team Leaders were assigned to the same department during the same fiscal period. Langenfeld Report ¶ 69. Among those transfers, he targeted those that were manual transfers and those that resulted in a Gainsharing report changing from deficit to surplus. *Id*. Langenfeld performed this analysis for six of the Mid-Atlantic stores during the time that the *Vasquez* Plaintiffs claimed that transferring labor hours was common. Langenfeld found that, in the last four fiscal periods of 2015, only eight of 52 transfers of a Team Leader's time, or 15.38%, involved a department flipping from deficit to surplus. *Id*. So, only a "relatively small" number of transfers of Team Leader time during the relevant period might have been made for an improper purpose. *Id*. ¶ 71. Langenfeld performed the same exercise for 252 other stores and, out of 3,015 manual transfers that met the two-Team Leader criterion, only 8.36% resulted in a department flipping from deficit to surplus. *Id*. ¶ 70.[10] The court agrees that Langenfeld's "analysis confirms that there is no statistical connection between multiple [Team Leaders] on a team and one of those [Team

---

[10] Even if the transfer of a Team Leader's hours did not result in an actual flip, but in a reduction of a deficit to near zero, unless there are hundreds of such transfers, Langenfeld's study still is strong evidence that there is not a correlation between two Team Leaders on the same Team and an improper transfer.

Leader's] home teams being brought out of deficit." Def's Opp'n at 14. And, as Langenfeld's analysis also makes clear, an individualized investigation still would be required to determine the validity of such transfer. Langenfeld Report ¶¶ 62–64. The need for an individualized assessment is fatal to the commonality and predominance requirements.

### B.    Common Law Claims

Plaintiffs also seek certification of a subclass (designated as subclass f, *supra* at 12) to adjudicate their state common law claims of breach of oral contract and the attendant duty of good faith and fair dealing (Count I), fraud in the inducement (Count XI), and unjust enrichment (Count II). This subclass fails for the same reason as the wage subclasses: proof of liability necessarily involves a highly fact-intensive inquiry as to each putative class member that overcomes Plaintiffs' claimed common issue regarding the presence (or absence) of unsupportable labor transfers.[11]

Courts have expressed skepticism that common law claims of the type asserted by Plaintiffs can be resolved on a class-wide basis. Plaintiffs' breach claim rests on the creation of an oral contract at the time of employment. Pls.' Reply at 18 (asserting that common evidence of breach includes that "Whole Foods' corporate leadership admitted that representations were made to staff members (*e.g.*, putative Class members) concerning the Gainsharing bonus program at the time of hire"). The Third Circuit has observed, however, that "it has become well-settled that, as a general rule, an action based substantially on oral rather than written communications is inappropriate for

---

[11] As an initial matter, Whole Foods asks the court not to certify this proposed subclass because Plaintiffs made no effort in their opening brief to demonstrate that variances among applicable state laws would not be a barrier to class-wide resolution. Def.'s Opp'n at 37–39. Plaintiffs responded in their reply brief with a multi-state analysis as to each common law claim that, according to them, demonstrates "no true conflict exists" among the various state laws. Pls.' Reply at 18 & n. 17, Exs. 56–59, ECF Nos. 193-4–193-7. Whole Foods countered with a demand to strike Plaintiffs' belated choice-of-law analysis. *See generally* Def.'s Mot. to Strike, ECF No. 195. The court does not need to address this dispute. Even if variation among state laws were to pose no impediment to class certification, the same fact-specific issues that afflicted Plaintiffs' wage sub-classes doom their common law claims subclass.

treatment as a class action." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 190 (3d Cir. 2001) (collecting cases); *see also Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 341 (4th Cir. 1998) ("The oral nature of the final review sessions makes them a particularly shaky basis for a class claim."); *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 597 n.17 (7th Cir. 1993) ("We note that there is some authority that claims based substantially on oral rather than written communications are inappropriate for treatment as class actions unless the communications are shown to be standardized.") (collecting cases).

A case involving "uniform" oral misrepresentations might present an exception, *see Reyes v. Netdeposit, LLC*, 802 F.3d 469, 490 (3d Cir. 2015), and Plaintiffs attempt to show such uniformity, *see* Pls.' Reply at 20, but the evidence is thin.  They cite to deposition testimony from various Whole Foods managers, but none said that Whole Foods made uniform oral representations to new or prospective hires about the Gainsharing program.  Pls.' Reply at 20 (citing Pls.' Mot., Ex. F, Dep. of Jane Mueller, ECF No. 179-62, at 149:12–150:16 (agreeing that new hires would be expected "to be just as interested in the financial package as [the deponent had] been"); *id.*, Ex. C-1, Dep. of David Gearhart, ECF No. 179-58, at 204:7–206:16 (admitting only that it would be reasonable to rely on representations of a Whole Foods interviewer, but not identifying any uniform representations about the Gainsharing program to prospective hires); *id.*, Ex. G, Dep. of Nicole Wescoe, ECF No. 179-63, at 141:4–143:16 (acknowledging that it would be unethical to make misrepresentations about the Gainsharing program, but not stating that it was Whole Foods' practice to make uniform representations about the program to new or prospective hires)).  Plaintiffs also cite to Whole Foods' *written* descriptions of the Gainsharing program in its internal policies, Pls.' Reply at 20, but the court already has held that those policies "create[] no

judicially enforceable contractual rights," *Vasquez v. Whole Foods Mkt.*, Inc., 302 F. Supp. 3d 36, 61 (D.D.C. 2018).

Plaintiffs' unjust enrichment claim suffers from similar problems. "[C]ommon questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009) (evaluating claim under Florida law); *accord Hoggard*, 2021 WL 7162301, at *11 ("As for the unjust-enrichment claim, resolving it also requires an inherently individualized inquiry under many jurisdictions' laws") (collecting cases). An unjust enrichment claim might be suitable for class resolution if it "involve[s] predominant common questions insofar as [it] require[s] a showing that Defendants were unjustly enriched at the expense of the Class Members." *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 116 (D.D.C. 2007). But for the reasons already discussed, deciding whether Whole Foods in this case unjustly enriched itself at the expense of any class of employees is an inherently individualized and fact-specific determination.

Finally, as to fraud in the inducement, it too is a claim that typically defies class-wide resolution. Plaintiffs concede that reliance is an element of that claim. Pls.' Reply at 22. However, "individual inquiries into reliance typically preclude a finding that common issues of fact predominate." *Gariety v. Grant Thornton*, *LLP*, 368 F.3d 356, 370 (4th Cir. 2004) (citations omitted). Plaintiffs respond that "acceptance of employment is circumstantial evidence of reliance." Pls.' Reply at 23. Perhaps so, but Plaintiffs have come forward with no evidence that Whole Foods' employees so commonly relied on representations about the Gainsharing program when accepting employment, such that the court could reasonably infer that acceptance alone was tantamount to reliance. They also have not shown that any state law would accept such a presumption of reliance. *Cf. Gariety*, 368 F.3d at 370 (noting that various states have declined to

adopt "a fraud-on-the-market presumption of reliance to substitute for finding individualized reliance") (collecting cases).

Ultimately, even if these claim-specific problems could somehow be overcome, determining liability still will require individualized factual determinations that predominate over any common proof. Whole Foods can be held liable only if Plaintiffs can show that a transfer of hours was improper, and that it resulted in lost wages. For the reasons already discussed, the answers to those questions cannot be resolved through common evidence on a class-wide basis.

### C.    Statutory Record-Keeping Violations

Finally, Plaintiffs seek class certification for record-keeping violations under District of Columbia (Count V) and Maryland (Count VIII) law. They rely on D.C. Code § 32-1008, which provides that every employer "shall make, keep, and preserve for a period of not less than 3 years . . . a record of . . . (C) [t]he rate of pay and the amount paid each pay period to each employee" and "(D) [t]he precise time worked each day and each workweek by each employee." D.C. Code § 32-1008; Am. Compl., ECF No. 13, ¶¶ 49–52. As for Maryland law, Plaintiffs' claim rests on Maryland Labor and Employment Code § 3-504, which requires an employer to give to each employee "at the time of hiring, written notice of (i) the rate of pay of the employee." Md. Code Ann., Lab. & Empl. § 3-504 (West); Am. Compl. ¶ 68. Plaintiffs cite as "common proof" for these claims Deloitte's finding that Whole Foods failed "to have supporting documentation for 96.6% of the 19,282 manual transfers occurring across 113 stores over a three-month period." Pls.' Reply at 17.[12]

---

[12] This statement is not precise. Plaintiffs merge Deloitte's assessment that 19.2% of the manual transfers were "[u]nsupportable"—meaning documentation was inadequate to decipher purpose—and 77.4% had "[n]o [d]ocuments." Def.'s Ex. II at 732257.

Plaintiffs' effort to certify a D.C. class for a violation of § 32-1008 fails.  The common proof Plaintiffs cite does *not* pertain only to D.C.-based stores.  It concerns over 100 stores from across the country.[13]  Plaintiffs present no evidence as to how many missing TTFs or other supporting documentation there might be for the D.C. stores.  More fundamentally, even if Deloitte's study was useful as common proof, Plaintiffs offer no explanation as to how that study establishes a failure to keep records concerning "the rate of pay and the amount paid each pay period to each employee" or the time worked by an employee.  Presumably, Plaintiffs believe that Whole Foods committed a recordkeeping violation by not possessing TTFs or other documents to support manual transfers and failing to maintain accurate records of wages owed to employees due to Gainsharing violations.  But that theory rests on the debunked notion that an unsupportable transfer was an improper one resulting in lost wages.  Missing TTFs, standing alone, do not constitute common evidence of a recordkeeping violation under D.C. Code § 32-1008.

As for the Maryland recordkeeping violation, no class is appropriate because the claimed common evidence is not proof of a violation.  Plaintiffs nowhere explain how the failure to preserve a TTF violates an employer's duty to provide written notice of the "rate of pay" "at the time of employment."

## V.    CONCLUSION AND ORDER

For the foregoing reasons, Plaintiffs' Motion for Class Certification, ECF No. 176, is denied.  The court denies as moot Defendant's motions to strike parts of the evidentiary record,

---

[13] Plaintiffs do not argue that D.C. law applies to any store outside the District.

ECF Nos. 183, 184, and 185, and Defendant's motion to strike portions of Plaintiffs' reply brief, ECF No. 195.

Dated:  March 10, 2025

Amit P. Mehta
United States District Judge